COMMONWEALTH *vs.* GEORGE W. HUGHES & another.

Middlesex.    March 16, 1903. — April 1, 1903.

Present: KNOWLTON, C. J., LATHROP, BARKER, & HAMMOND, JJ.

*Evidence,* Relevancy.    *Witness,* Examination.    *Arrest.    Practice, Criminal,* Exceptions.    *Homicide.*

A police officer, who was a witness for the government in a murder trial, put on a pair of glasses to examine a map to which his attention was called when on the witness stand. On cross-examination he testified that for one or two years he had used glasses in reading and writing, but for no other purpose. The defendant then asked leave to exhibit the glasses to the jury in order to show the thickness of the lenses as evidence that the witness had defective vision. The judge excluded the glasses as evidence. *Held,* that the exclusion was right.

A police officer, who in a murder trial had testified for the government that he arrested the defendant, and who had been cross-examined as to the description given to him of the person to be arrested, was asked, on redirect examination, from whom he got the description, and answered that he got it from the person alleged to have been murdered, who was another police officer. *Held,* that the question and answer were admissible as a proper explanation of his testimony upon cross-examination.

On the trial of a defendant charged with murdering a police officer, a witness for the government testified that after the shooting he found the wounded officer in front of the police station, and then was asked whether he had any conversation with him, and answered "Yes." *Held,* that the question and answer were ad-

missible, to show the physical condition of the wounded man immediately after the shooting, no statement of either party to the conversation being asked for.

In this Commonwealth the general proposition, that a police officer lawfully cannot arrest without a warrant a person whom he has reasonable ground to suspect of having committed a crime not a felony, is not correct, as there may be circumstances other than the officer's suspicion justifying the arrest of such a person under the provisions of the statutes.

On the trial of two defendants for the murder of a police officer who had arrested them without a warrant, it appeared, that the defendants were seen walking with the officer at a very late hour of the night toward the police station, that they presented the appearance of suspicious looking characters, and that one of them shot the officer on the way to the station, whereupon they both ran away. *Held*, that there was evidence to justify a finding that there had been a legal arrest under R. L. c. 31, § 2.

On a trial for the murder of a police officer who had arrested the defendant without a warrant, if the judge in his charge has dealt in general terms fully and correctly with the doctrine of burden of proof beyond a reasonable doubt, no exception lies to his refusal to give a specific instruction, that when the legality of an arrest is in question in a criminal case the burden is on the government to prove the legality beyond a reasonable doubt.

On a trial for the murder of a police officer who had arrested the defendant without a warrant, the jury at the defendant's request were instructed that " if an officer has lawfully in his custody a person charged with having committed a crime not a felony, the officer is not authorized, in order to prevent his escape, to shoot him, or at him, or to draw a dangerous weapon for the purpose of preventing such escape." In a previous portion of the charge they had been instructed that if they found that the " defendant was in actual bodily fear by reason of some assault or threatening action upon him by the officer which was not justified by their situation, and that the shooting was done in mere self-defence, it would be justifiable homicide." *Held*, that these instructions left the defendant no ground to complain that a certain other instruction on the same subject requested by him was not given in terms.

BARKER, J.   This was an indictment for murder charging the defendants with shooting Thomas Keefe a police officer of Everett on February 20, 1902.   The defendant Hughes, against whom the jury found a verdict of guilty of murder in the second degree, was about forty-five years of age, and was the uncle of the defendant Blake who was acquitted by the direction of the court, and who was about seventeen years old.   Hughes and Blake lived together in Charlestown.   The night of February twentieth was clear and cold and with a bright moon.   The evidence tended to show that the defendants rode in a closed street car from the terminal station of the Elevated Railroad in Charlestown and left the car at Everett Square on Broadway in Everett at 12.30 A. M. and asked the way to the Catholic chapel, which was on Broadway, and then walked in the direction of the chapel.

At one o'clock officer Keefe who was on duty and in uniform was seen standing on the sidewalk near the Catholic chapel. At 1.10 A. M. he was seen in company with the two defendants near the post office on the opposite side of Broadway to the chapel and nearly in front of it, walking toward Everett Square. They crossed Broadway and were walking together, and were going in the direction of the police station.

Another police officer, Morrill, testified that he left the police station at one o'clock, and that about ten minutes past one he saw officer Keefe with the two defendants and crossed the street to see if Keefe needed help and was on the edgestone of the sidewalk when Keefe and the defendants came along; that Keefe was next to the edgestone, Hughes next to Keefe on the inside and the defendant Blake just ahead of Hughes. That the witness spoke to Keefe, merely passing the time of day, and after they passed walked along behind them for a time and then for a short time stood on the corner of Broadway and Chelsea Street which was five or six hundred feet from the police station, and that before he left the corner they were beyond the patrol box going in the direction of the station.

The evidence further tended to show that when Keefe and the defendants were within about two hundred feet of the station two shots were fired one after the other at an interval of from three to ten seconds, and that one of these shots entered Keefe's body near the middle of the back and fatally wounded him. That the two defendants ran away, Blake in the direction in which they had been walking down Broadway and being immediately followed and arrested within seven minutes after the shooting, and that Hughes ran down another street and was arrested at the place where he lived in Charlestown at about six o'clock the same morning. When arrested neither defendant had firearms in his possession.

In the street car on the way to Everett, Blake wore white overalls such as are used by masons and about his neck a red and white muffler resembling in color a red and white table cloth about four feet square found about the neck of Hughes at the time of his arrest, and which belonged on the table in the house where the defendants lived, and which was not on the table at twelve o'clock on the night of the homicide. The evidence tended to show that this cloth or muffler was not worn by either

defendant when they were walking on Broadway with officer Keefe. The evidence tended to show that when they were so walking Blake was swinging in his hand a hatchet like a mason's hatchet, and that this after the shooting was picked up on the sidewalk near the place of the shooting. The evidence also tended to show that Hughes wore a broad brimmed slouch hat pulled down over his eyes, and a long dark overcoat much worn, and had a two or three weeks' growth of beard and an unkempt appearance, and that both of the defendants when in the street car were "suspicious looking characters" and not "respectable looking people" and that Hughes was a "hard looking man" having a "general tough appearance."

After the arrest of Hughes he denied having been in Everett and said that he had passed the night from about half past eight in the evening until between three and four o'clock in the morning with a man named Mullen at a house in the South End of Boston on Pleasant Street where they sell liquor and have women, and that he did not know enough to go there again, and did not know where to find it.

The evidence also tended to show that when officer Keefe and the defendants were walking down Broadway, Hughes had his hands in the pockets of his overcoat, and that the coat was left in his possession after his arrest, and that when he had been in jail some weeks he was asked for the clothing which he wore into the jail and delivered all but this overcoat; that at a later time he was asked for the overcoat and then took it from under the mattress of his bed and delivered it to the officer and said that he had forgotten it before. The pocket lining appeared to have been cut and torn and there was a large hole in it. Outside the coat opposite this hole in the pocket was a hole in the coat which showed that the nap of the cloth had been removed around the hole, and there was evidence that the hole in the coat was as large when Hughes was arrested as at the time of the trial. There were no powder marks visible on the coat of officer Keefe, and there was no testimony that there were powder marks on Hughes' coat or pocket.

The evidence also tended to show that a police sergeant in charge of the station at the time of the shooting heard the shots and when he heard the first one went to the window, and from there about two or three seconds after the second shot saw offi-

cer Keefe in front of the station, with his revolver in his right hand, motioning to the sergeant and looking up at the window, and that Keefe then went into the station and laid his revolver on the desk, and that the revolver was not smoking and that every chamber in it was loaded; that of the five cartridges in it four had indentations, one of the four two indentations, and that one cartridge was not indented, and that there was a catch on the revolver which when down would prevent the cartridge from being exploded when the trigger was pulled. The defence admitted and contended that Keefe must have attempted to fire his revolver and have failed to discharge it.

Three of the exceptions relate to evidence. Morrill the police officer who testified that he was on the edgestone when Keefe and the defendants passed in the direction of the station just before the shooting, put on a pair of glasses when examining a map to which his attention was called while on the witness stand. Upon cross-examination he testified that he had used glasses for one or two years to read and write, but that he used them for no other purpose; that he did not wear glasses at night, and did not have them on the night of the shooting. The defendants then asked leave to exhibit to the jury the glasses which the witness had used in examining the map, and to introduce them in evidence in order that the jury might observe the depth of the lens and the density of the glass to prove that the witness had defective vision. The court excluded the glasses as evidence and the defendants excepted.

This exception must be overruled. That any one who uses certain glasses to read and write or to examine a map has no tendency to show that without glasses he cannot clearly see persons near him in the street.

Flynn, a police officer of Everett, testified for the Commonwealth that he arrested the defendant Hughes in Charlestown on the morning of the shooting. Upon cross-examination he was asked in detail what kind of a man he was seeking for, and whether he had had such a man described to him and whether the witness got that description before he left Everett for Charlestown, and in answer to these questions testified to the height, weight, complexion, clothing, beard and nationality of the man for whom he was to seek, and that he did have such a

man described to him and did get the description before he left Everett. On redirect examination he was asked from whom he got the description and answered that he got it from officer Keefe. The defendants excepted to this question and answer.

This exception must be overruled. The witness had been asked upon cross-examination many questions as to a description of the man whom he was to seek at Charlestown and had been made to testify that this description had been given to him and given to him before he left Everett, which must have been after the shooting and upon the same morning with that and with the arrest. Under these circumstances, the question called for a proper explanation of his testimony upon cross-examination. *Commonwealth* v. *Kennedy*, 136 Mass. 152, 155.

A witness called by the Commonwealth testified that he found officer Keefe, after the shooting, in front of the police station and was then asked whether he had any conversation with him, and answered "Yes." To this question and answer the defendants excepted.

This exception must be overruled. The evidence that there was a conversation was competent upon the physical condition of Keefe immediately after the shooting, and no attempt was made to put before the jury any statement made by either the witness or Keefe.

The other exceptions relate to instructions requested and not given or not given in terms. The requests are stated in two different places in the bill of exceptions. The first statement is that Hughes requested five instructions which are set forth in the bill, and that the court refused to give them. The second statement is that "exceptions to the refusal of the court to rule as requested by the defendant were noted as follows." Then follow certain requests numbered 1, 3, 4, 5 and 7. Of these that numbered 1, "The defendant Hughes requests the court to order a verdict of not guilty as to him," is not found among the requests stated in the earlier part of the bill. The requests there numbered 1 and 2 in the statement of what exceptions were taken are both included under the number 3, and the requests numbered 3, 4 and 5 in the first statement are numbered respectively 4, 5 and 7 in the subsequent statement. These discrepancies if not understood might lead to confusion in considering the briefs upon which only the case was submitted.

If the request to order a verdict of not guilty as to Hughes was duly made and was refused under exception, it has not been argued upon his brief, and the exception therefore is waived. It makes no difference with the result whether the requests numbered 1 and 2 in the first statement are considered as one request or as two. They are as follows: (1) "A police officer may, without a warrant, arrest a person when he has reasonable or probable ground to suspect said person of having committed a felony; (2) A police officer cannot lawfully arrest without a warrant a person whom he has reasonable ground to suspect of having committed a crime not a felony."

The first sentence quoted was given in substance in the charge, which instructed the jury that it is the law in this Commonwealth that a peace officer may arrest without a warrant a person whom he had reason to suspect of having committed a felony. The second sentence is incorrect in law. It states as a general proposition governing all cases in which an officer has reason to suspect a person of having committed a crime not a felony, that the officer cannot lawfully arrest that person without a warrant. Assuming that the officer cannot lawfully arrest that person without a warrant if the officer has no other ground for making the arrest than his suspicion that the person has committed a crime not a felony, still the officer may be justified in making the arrest without a warrant by other circumstances, as by the fact of the existence of express statutory authority in the case of many different offences, or by the provisions of the statutes relating to watch and ward. If the meaning of the request was that just assumed, we think the charge sufficiently and correctly covered the law as to arrest without a warrant. For these reasons the exceptions relating to the requests just quoted must be overruled.

The requests numbered 3 and 4 in the first statement of the bill and 4 and 5 in the second were as follows: (3, 4) "There is no evidence of a legal arrest in this case." (4, 5) "When the legality of an arrest is in question in a criminal case, the burden is on the government to prove the legality beyond a reasonable doubt." We think there was evidence from which the jury could find that the officer had made a legal arrest of the defendants before the shooting. They were walking with him at a

very late hour of the night toward the police station. It is plain that in the discharge of his duty he must have found them upon his beat so dressed and having such an appearance that under the circumstances he would be justified in suspecting them of an unlawful design, and in examining and arresting them under the provision of R. L. c. 31, § 2, relating to watch and ward. The fact that one of them shot the officer who was conducting them to the station, and that thereupon both defendants ran away, with the other evidence was enough to justify a finding that there had been a legal arrest. As to the other of these requests, the court was not bound to give it in terms, nor to refer specifically to the burden resting on the government to prove the legality of the arrest beyond a reasonable doubt. The charge in general terms and at considerable length dealt fully and correctly with the doctrine of burden of proof beyond a reasonable doubt and this was all that was necessary.

The remaining request, numbered 5 in the first statement and 7 in the second, is as follows: "If an officer, having lawfully in custody a person who is charged with having committed a crime not a felony, draw a revolver, or threaten to shoot, or shoot, or shoot at such person, while the latter is attempting to escape, and thereby put such person in fear of his life, or of great bodily injury, such person may justifiably kill the officer."

The jury were instructed in terms at the defendant's request that "If an officer has lawfully in his custody a person charged with having committed a crime not a felony, the officer is not authorized, in order to prevent his escape, to shoot him, or at him, or to draw a dangerous weapon for the purpose of preventing such escape." They had been instructed in a previous portion of the charge that if they found that the "defendant was in actual bodily fear by reason of some assault or threatening action upon him by the officer which was not justified by their situation, and that the shooting was done in mere self defence, . . . it would be justifiable homicide."

We are of opinion that these instructions given left no ground to the defendant to complain that his request was not given in terms.            *Exceptions overruled.*

*J. J. Walsh & T. P. Riley,* for the defendant Hughes.

*G. A. Sanderson,* District Attorney, & *H. Bancroft,* Assistant District Attorney, for the Commonwealth.