COMMONWEALTH *vs.* THOMAS FARRELL.

Suffolk.     January 5, 7, 1948. — April 12, 1948.

Present: QUA, C.J., LUMMUS, DOLAN, RONAN, & WILLIAMS, JJ.

*Assault and Battery. Maiming. Practice, Criminal,* Election; Charge to
jury; Exceptions: whether error harmful. *Election. Evidence,* Pre-
sumptions and burden of proof; Opinion: expert; Of reputation.
*Intent. Intoxication. Error,* Whether error harmful. *Witness,* Cross-
examination, Contradiction. *Words,* "Dangerous weapon," "Maim,"
"Cripple," "Bodily harm."·

At the trial of indictments for assault, there was no error in the denial
of a motion that the Commonwealth be required to elect among
sundry assaults shown by the evidence as having occurred over a
period of several hours, where they formed substantially a continuous
series of assaults; and it was immaterial that the continuity of the
assaults was temporarily interrupted and that several means of assault
were employed.
A lighted cigarette might properly be found to be a "dangerous weapon"
within G. L. (Ter. Ed.) c. 265, §§ 14, 15A, where it was used to inflict
serious burns upon another person.
A finding of intent to maim and of maiming on the part of an assailant
within G. L. (Ter. Ed.) c. 265, § 14, was warranted by evidence that
with lighted cigarettes he inflicted a large number of serious burns
upon the body of another, the scars of which would be permanently
visible and which impaired for a time that person's ability to walk
freely and to sit at ease.
A trial judge, who fully and correctly charged the jury in general terms
that the burden was on the Commonwealth to prove beyond a reason-
able doubt that the defendant committed the acts charged in an
indictment for assault with a dangerous weapon, was not required to
charge also that the burden was on the Commonwealth to prove
beyond a reasonable doubt that the complainant did not inflict on
himself bodily injury shown by the evidence.
Whether or not a woman consented to intentional acts of a man in burning
and cutting her was immaterial on the issue of his guilt of committing
assaults on her with dangerous weapons as charged in indictments
under G. L. (Ter. Ed.) c. 265, §§ 14, 15A.
At the trial of an indictment for assault with a dangerous weapon, there
was no error in the refusal of a requested instruction to the jury that
the defendant must be acquitted if, at the time he committed the
assault, "he was so far intoxicated as to be unable to form a guilty
intent."
A requested instruction to the jury at the trial of an indictment, that a
fact alleged by the Commonwealth and denied by the defendant, if

"unusual, unaccountable, and not warranted by the circumstances," would not "be likely to obtain credit with a jury," would have been a charge on the facts and was refused properly.

Error prejudicial to the defendant at the trial of an indictment was not shown by the admission of certain testimony which, although hearsay, was immaterial to the issues on trial.

Whether or not one subjected to a series of burns over a period of several hours would have made an outcry was a matter as to which opinion testimony by experts would not have aided the jury and was excluded properly.

Reversible error in the exclusion of a time table offered as evidence by the defendant at the trial of an indictment was not shown where there was no offer to show what it was expected to prove.

The defendant at the trial of an indictment was bound by testimony as to collateral matters elicited from a witness for the Commonwealth on cross-examination, and was not entitled to introduce evidence to contradict that testimony.

At the trial of an indictment for assault on a woman, there was no error in striking out testimony by a witness for the defendant that the complainant's reputation for chastity was bad, where it appeared from cross-examination that the witness had only an indefinite and inadequate understanding of the meaning of the word chastity.

Two INDICTMENTS, found and returned on May 17, 1946. The cases were tried before *Voke,* J.

*H. F. Callahan,* for the defendant.

*Edward M. Sullivan,* Assistant District Attorney, for the Commonwealth.

DOLAN, J.　On May 17, 1946, the defendant was indicted for assault and battery upon Helen Stavrou by means of a dangerous weapon. This indictment, No. 1811, is in two counts. The first count charges that on March 16, 1946, the defendant "did commit assault and battery upon one Helen Stavrou, by means of a certain dangerous weapon, to wit: a lighted cigarette." The second count charges that at the time aforesaid the defendant "did commit assault and battery upon one Helen Stavrou, by means of a certain dangerous weapon, to wit: a razor blade."

On May 17, 1946, the defendant was also the subject of an indictment, No. 1812, charging in a single count that he, on March 16, 1946, "with intent to maim and disfigure one Helen Stavrou, did assault the said Helen Stavrou with a certain dangerous weapon, to wit: a lighted cigarette, and, by such assault, did disfigure, cripple, and inflict

serious and permanent physical injury upon the said Helen Stavrou."

At the same time two other indictments were returned against the defendant concerning certain alleged conduct of his toward said Stavrou, upon each of which the jury returned a verdict of not guilty." [1]

The defendant was found guilty on both counts of indictment No. 1811, and guilty on indictment No. 1812. He was sentenced to the State prison for a term of not more than five years and not less than three years on each count of indictment No. 1811, and on indictment No. 1812, the sentences to be served concurrently, but execution of the sentences was stayed in accordance with G. L. (Ter. Ed.) c. 279, § 4, as appearing in St. 1935, c. 437, § 3. The case comes here upon the defendant's appeals, accompanied by an assignment of errors, a summary of the record, and a transcript of the evidence, under the provisions of G. L. (Ter. Ed.) c. 278, §§ 33A–33G, as amended by St. 1939, c. 341.

The jury could have found, among others, the following facts: Helen Stavrou (hereinafter called the complainant) was eighteen years of age at the time of the events in question. While working as a vari-typist at Westover Field, an army air base in Holyoke and Chicopee, she met the defendant for the first time on February 1, 1946, when he and another officer introduced themselves to her and a companion. Thereafter she saw him quite frequently, the mess hall of which he had charge being located next to her office at the base. From time to time thereafter she met him by chance, including a meeting on March 9 on a train from Springfield to Boston. They met by arrangement the next evening, March 10, at Trinity Station, Boston, and went to a café located on Columbus Avenue. Later that night the complainant secured a room at a hotel at which the defendant called for her the next morning and they rode back to Springfield on the train. They went out on a "date"

---

[1] Indictment No. 1809 charged the defendant with committing an unnatural and lascivious act with said Helen Stavrou. Indictment No. 1813 charged that the defendant indecently assaulted and beat said Stavrou.

Thursday evening, March 14, and the defendant asked her if she wanted to go to Boston with him on the week-end. The next day she agreed to do so. On Saturday, March 16, they took the 12:10 p.m. train to Boston. They arrived about 2:40 p.m. and first went to a package goods store in the vicinity of Park Square where a "fifth" of whisky was purchased for which the complainant paid. They then went next door to a tavern, which was located across the street from the main entrance to the Hotel Statler. The defendant told the complainant to go over to the hotel and see whether she could secure a room. She applied for a room but was unable to obtain one. When she returned and informed the defendant, he said he thought he could get one, that he knew people around there since his brother used to work there, and that he knew the "bellhops the captains." He left, taking the bottle of liquor with him, and was gone three hours. While the complainant sat alone at the tavern, she had two beers. Fifteen minutes before the defendant returned, a man came over to her and said, "Tommy has got a room, he will be over in a few minutes."

Upon the defendant's return, at 6 p.m., he gave the complainant a key, saying that it was the key to room W–619. The complainant then went to the hotel to dress to go out for the evening. The defendant had told her he would see her later. When she got to the room, her bag was there. It was an overnight bag in which, in addition to clothes, she had a safety razor. The room contained the furnishings usually found in hotel bedrooms. A bathroom led off the main room. There was a telephone in the room.

After the complainant had changed her dress, she placed her bag on the rack at the foot of the bed. At about 6:30 p.m. she heard a knock and opened the door, and the defendant came in. He locked the door and said they were not going out. He then told her to take off her clothes, and when she declined to do so he started taking them off. She tried to put the clothes on again and he tore some of her underclothes. While he was taking off her clothes, he asked if she had a razor, and she said, "No." He went to her suitcase and found the one before referred to. He took

off all her clothes and threw her lengthwise on the bed. He removed the blade from the holder and said, "Don't cry or scream or make any noise or I will kill you." He then started shaving the hair around her vagina. At that time he was naked and was sitting on the edge of the bed. The complainant was struggling and trying to get up but the defendant pushed her down again. He told her not to move. He then started slashing her thighs with the razor blade. There were three or four slashes on each leg. He also cut six slashes on her lower abdomen. She was bleeding from these cuts, and he wet some towels and applied them to the cuts.

Then followed acts of sexual relation, during the course of which the defendant began to burn the complainant's right breast with a lighted cigarette. He used about five lighted cigarettes to burn a capital T, the first letter of his given name, on her right breast. She started to cry and struggled, but she made no outcry. She was "in fear."

At about 9:30 P.M. the defendant telephoned the bell captain, saying, "This is Tommy," and told him to bring up some unguentine and mercurochrome. Shortly thereafter the bell captain arrived with the unguentine and mercurochrome. At that time the complainant was nude and in the bathroom. The defendant got her pajamas from her suitcase and brought them in to her. They came out of the bathroom together and the defendant introduced the bell captain to her. He and the defendant had two or three drinks together and were talking and joking. The bell captain remained in the room about five minutes. The complainant made no complaint to him. After he left, the defendant spoke to someone who was outside the room but who did not enter.

When the defendant came back in the room, the door was locked. He removed the complainant's pajamas, threw her on the bed, and started burning with a lighted cigarette a capital F, the first letter of his surname, on her left breast. When he finished he applied unguentine. Then he burned with a lighted cigarette or cigarettes a capital T on her upper, inner right thigh and applied unguentine. He then

burned in like manner a capital F on her upper, inner left thigh and applied unguentine. The capital T was two inches "high" and the F approximately three inches "high." The defendant then started burning her buttocks with lighted cigarettes, first a capital T on the left buttock, after which he applied unguentine, and then a capital F on the right buttock. These were both approximately three inches "high." The defendant brought her in front of the full length mirror in the bathroom and showed her the burns on each buttock. He said that, now that he had burned her permanently, she was his and she would never cheat on him. Then he brought her back, put her on the bed, and, saying the letters on her buttocks were not good enough, "did them over" with lighted cigarettes.

These events took place between 6:30 P.M. March 16 and 11:30 A.M. March 17. At no time did the complainant make any outcry. She was "afraid," "in fear," "in mortal fear," "frightened to death," "horrified." She could not help tears coming to her eyes.

The complainant left the room at 11:30 A.M. March 17 wearing shoes and with a sheet wrapped around her shoulders. The defendant had thrown the sheet at her, saying, "Don't come near me or I will kill you." She took the key and locked the defendant in the room as she left. At that time he was on the bed. She went to the end of the corridor and spoke to the floor clerk. She was placed in a linen closet. She showed the floor clerk her burns; and she told a maid who was there that she was burned on the buttocks. The assistant manager of the hotel and the bell captain came at once to the linen room, and the former showed her the registration card for the room. The assistant manager and a hotel policeman went back to the room with her where she was told to get dressed and pack her things. As the complainant was packing, the defendant asked her for $10 which she gave him.

The complainant then went to the South Station where she sent a telegram. She took the two o'clock train for Auburn, New York, where she saw her sister-in-law shortly after 1 A.M. Monday, March 18. She returned Monday

night to the civilian barracks where she lived at Westover Field. She saw the defendant at 1:30 P.M. Tuesday in front of the office building where she worked. He said, "I want to see you tonight, I have got something important to say to you." Later that afternoon the complainant saw Dr. Edwin Mahoney at his office in Holyoke. In accordance with the request of the defendant, she met the defendant that night. The complainant asked what he wanted to see her for that was so important. He said he had been worrying about her, where she was Sunday, what she did when she left, and when she came back. He said he had "called" her. He also told her that he went home and talked with his mother; that he had been pretty drunk; that he was sorry for everything he did; that he did not mean to do it but he was drunk. She told him she had been to the doctor's that day, and he asked if she had told the doctor anything about it. He told her not to do so, because he did not want to get in trouble. She asked him if he was married. She had found out that morning that he was married. He informed her he was married and had a child on the West Coast, but that they were separated. He did not want anybody finding out about those things because it would make trouble for him. He asked her if she was pregnant and she said she did not know.

The complainant next saw the defendant outside his mess hall sometime between March 20 and 30, at which time she was asking him for her money. He replied, "Try and get it." Then she saw him March 30 in front of her office where he gave her some pills and told her to take them. She saw him again in front of his mess hall April 1, and he asked if she had taken the pills. She told him that she had not, that she had been consulting her doctor, that she did not intend to take them, and that she did not need to take them.

During the week-end of April 5, 6 and 7, the complainant visited her sister in New Hampshire. On April 9 she went to see Lieutenant Gallagher of the detective bureau of the Springfield police department. On April 13 she spoke with policewomen at Boston police headquarters. That after-

noon she telephoned the defendant at his home and asked if she could see him. She asked him whether he wanted the pills and said he could have them if he met her that night. He agreed to meet her at a café in Boston between 7:30 and 8 P.M. She went to the café accompanied by two policewomen. They did not sit in the booth that she entered. About 9 P.M. the defendant arrived and she asked him to sit down. Then she said, "You are going to hate me for this, but I have got to do it." He said, "Do what?" One of the policewomen then went over to the booth, and addressing the defendant told him that she was a Boston "policewoman" and said to him, "Are you Lieutenant Farrell?" The defendant answered, "No." At the request of the policewoman, the defendant showed her his identification card. She then said, "Then you are Lieutenant Farrell?" and he replied, "Yes." She informed him in substance that he was under arrest and conducted him to police headquarters.

On May 4, at the request of the district attorney, photographs of the burns and cuts that had been inflicted upon the several parts of the complainant's body were taken in the presence of a policewoman. The photographs were exhibited to the jury and are before us as exhibits. The jury could have found properly that the burns on the breasts and buttocks of the complainant were plainly visible in the form either of the capital letter T or of the capital letter F, that the burns on her inner, upper thighs were also visible when the photographs were taken, and that that on the upper, inner left thigh was in the form of the capital letter F.

Evidence tending to show other material facts will be recited in the consideration hereinafter of certain of the defendant's assignments of error to which it is most pertinent.

The defendant filed seventy assignments of error of which only thirty have been argued. Those not argued are deemed waived. *Commonwealth* v. *Noxon,* 319 Mass. 495, 534. We proceed to consider those argued in the order in which they have been argued by counsel for the defendant.

Assignments of error 9, 48 and 49. The last two assign-

ments are based upon exceptions to the denial of motions of the defendant, at the close of all the evidence, that the Commonwealth be required to elect which of the various alleged assaults upon the complainant it relied upon as to both counts of indictment No. 1811 and as to indictment No. 1812. Assignment 9 was based upon an exception to the failure of the judge to pass upon similar motions made at the close of the Commonwealth's case. There was no error. It is true that a defendant who has been set to the bar to face a single issue may compel an election when two distinct offences have been put in evidence, to either of which the averments of the indictment were applicable. *Commonwealth* v. *Blood,* 4 Gray, 31, 32. *Commonwealth* v. *Dean,* 109 Mass. 349, 352. *Commonwealth* v. *Coyne,* 207 Mass. 21, 23–24. But the Commonwealth will not be required to elect where, as here, the evidence was of substantially continuous felonious assaults upon the complainant. *Commonwealth* v. *Sullivan,* 146 Mass. 142, 145. *Scaffidi* v. *United States,* 37 Fed. (2d) 203, 206. *Hamilton* v. *State,* 153 Ala. 63. *People* v. *Enright,* 140 Cal. App. 649, 651. *State* v. *Higgins,* 121 Iowa, 19, 26. *Ledesma* v. *State,* 147 Tex. Cr. 37, 41. And the fact that more than one means of assault was employed, *State* v. *Nieuhaus,* 217 Mo. 332, 345; *People* v. *Oppenheimer,* 156 Cal. 733, 740, or that the continuity was temporarily interrupted, *Cheatwood* v. *State,* 26 Ala. App. 440 (certiorari denied 230 Ala. 574); *State* v. *McCombs,* 163 Kans. 225, does not require a different result.

Assignments of error 54 and 55 concern the denial by the judge of the defendant's motion that the jury be directed to return a verdict of not guilty on count 1 of indictment No. 1811 and on indictment No. 1812, charging in each. instance an assault with a dangerous weapon, to wit: a lighted cigarette. The contention of the defendant is that a lighted cigarette is not a "dangerous weapon" within the meaning of G. L. (Ter. Ed.) c. 265, §§ 14, 15A, the basis of the indictments just referred to.

The judge instructed the jury as follows: "A dangerous weapon, in legal definition, is any instrument or instru-

mentality so constructed or so used as to be likely to produce death or great bodily harm. It may also be defined as an instrument or instrumentality which, because of the manner in which it is used, or attempted to be used, endangers the life or inflicts great bodily harm; or is calculated as likely to produce death or serious bodily injury. An instrument or instrumentality most innocent appearing and harmless in and of itself may be used in such a dangerous and harmful manner, may be used in such a manner that it causes such serious bodily injury that because of such manner of use . . . you would be warranted in finding that such an instrument or instrumentality was a dangerous weapon within the meaning of the law." The judge left it to the jury to determine whether upon the evidence the lighted cigarettes as used by the defendant were in fact dangerous weapons. The instructions of the judge as to the subject matter were adequate and correct. Although a lighted cigarette is not a dangerous weapon when used for the purposes for which it is intended, it may become such, as the judge instructed the jury, by the manner in which it is used. *Commonwealth* v. *Drew,* 4 Mass. 391, 395-396. *People* v. *Goolsby,* 284 Mich. 375, 378.[1] Lighted cigarettes not being in themselves dangerous weapons, the question whether as used in the present case they were dangerous weapons was one of fact for the jury. *Commonwealth* v. *Drew,* 4 Mass. 391, 396. *State* v. *Bloom,* 91 Kans. 156, 158. *United States* v. *Small,* 2 Curt. C. C. 241, 244. *Rex* v. *Noakes,* 5 C. & P. 326, 328.

Assignments of error 50, 51, 52, 53, 56, 57, 58, 59 and 68. (1) Assignments 50 and 56 are based upon exceptions to the refusal of the trial judge to instruct the jury, as to indictment No. 1812, that there was no evidence to warrant a finding that the defendant assaulted the complainant with the intent to maim her. Assignment 68 is based upon an exception to the following instruction given by the trial

---

[1] *People* v. *Crowl,* 28 Cal. App. (2d) 299, 305 (kit of automobile tools). *State* v. *Reynolds,* 209 La. 455, 457 (beer bottle). *State* v. *Dineen,* 10 Minn. 407, 411 (stone). *State* v. *Huntley,* 91 N. C. 617 (switch). *State* v. *Beal,* 170 N. C. 764, 766 (rock). *Tipler* v. *State,* 78 Okla. Cr. 85, 89 (leather strap). *Smith* v. *State,* 79 Okla. Cr. 151 (pair of shoes).

judge: "To maim in legal significance means, one. to cripple or mutilate in any way; two, to inflict upon a person any injury which deprives him or her of the use of any limb or member of the body or renders him or her lame or defective in bodily vigor; three, to inflict any serious bodily injury." (2) Assignments 51 and 57 are based upon exceptions to the refusal of the judge to instruct the jury that there was no evidence to warrant a finding that the defendant did cripple the complainant. (3) Assignments 52 and 58 are based upon exceptions to the refusal of the judge to instruct the jury that there was no evidence to warrant a finding that the defendant did inflict serious physical injury upon the complainant. (4) Assignments 53 and 59 are based upon exceptions to the refusal of the judge to instruct the jury that there was no evidence to warrant a finding that the defendant did inflict permanent physical injury upon the complainant.

Upon this branch of the case there was evidence as follows: The complainant testified that when she examined herself March 18 in Auburn, New York, the T and F on her breasts had begun to blister. There was a watery discharge from the T and F on her respective upper, inner thighs where blisters had broken and her legs were rubbing together. There was also a watery discharge from the T and F on her buttocks, and they were inflamed and bleeding as a result of sitting on them. On Wednesday, March 20, most of the blisters had broken; the ones on her inner thighs especially had been torn off from friction of her legs, had become irritated and started bleeding. The jury saw the scars on the complainant's breasts, and she testified that those on her buttocks were larger, darker and more prominent; that the T and the F on her inner, upper thighs were more prominent, darker, and more sensitive because of friction; and that the T on her right leg is raw at times.

Dr. Edwin Mahoney of Holyoke, who treated the complainant ten times, said that his first examination on March 19 revealed ten or eleven superficial cuts on her lower abdomen and one thigh, which, in his opinion, were caused by some sharp, cutting instrument; that the burns were

red, partly crusted with a scab formation, and water in a few areas; that the T on the right breast was a series of twelve rounded burned areas, one quarter inch in diameter; that the F on the left breast consisted of ten such burns; that the T on the left buttock was made up of nine such burns; that the F on the right buttock consisted of eleven similar burns; that the F on the left inner thigh consisted of nine similar burns; that the T on the right inner thigh was a continuous burn of which no individual areas could be distinguished; and that in all there were fifty-one individual third degree burns. He further testified that all the burns were to a moderate degree infected; that the one on the right inner thigh was not crusted over; and that when the complainant was discharged by the witness on April 19 the burns were all healed except that on the right inner thigh.

Dr. Alan R. Moritz, assistant medical examiner for Suffolk County, examined the complainant on July 1. He testified that it was difficult to determine the exact number of individual burns that made up the letters, because in some places small pale spots were there, where there had been loss of tissue, and scar formations ran into one another; that the most severe scar was the T on the inner aspect of the right thigh; and that he found several linear scars, which he described as long scars of fine-line appearances apparently marking the site of incised wounds, on the lower part of the abdomen and on the inner aspect of the thighs. Dr. Moritz expressed the opinion that "necessarily parts of those burns were third degree, and that they had destroyed some of the surfaces, more than the surface, but they resulted in scar formation"; and that many of those scars will be permanent in the sense that they will always be visible as long as the complainant lives. He further testified that he did not know whether the scars were of burns that had completely gone through the dermis or not, but that he did know that part of the dermis had been destroyed; that all of the scars could be raised with the exception of the one on the inner aspect of the right thigh; and that there was more fixation there than else-

where. The witness also expressed the opinion that some of the linear scars on the complainant's lower abdomen and upper thighs will be permanent in the sense that they will always be visible.

Dr. Robert H. Aldrich, called by the defendant, testified on cross-examination that when he examined the complainant on June 26 no one of the burns or linear scars was completely healed. He said it would be six more months before the wounds would be completely healed. Another witness, called by the defendant, declared that she saw the complainant sometime during the week starting March 18 at Westover Field and that she noticed something about her physical condition, "her walk."

Manifestly the evidence in the instant case would have warranted the jury in finding that as a result of the burns inflicted by the defendant upon the body of the complainant she had been disfigured; that many of the scars resulting therefrom and from the cuts inflicted on her lower abdomen and upper thighs will be permanent in the sense that they will be visible as long as the complainant lives; and that the defendant by his conduct inflicted serious and permanent physical injury upon her. That this constitutes a maiming within the meaning of the statute is evidenced by the language of the statute upon which the indictments or one or more counts therein were based, since in express terms it is provided, so far as here pertinent, that ". . . whoever, with intent to maim or disfigure, assaults another person with a dangerous weapon . . . and by such assault disfigures, cripples or inflicts serious or permanent physical injury upon such person . . . shall be punished . . . ," G. L. (Ter. Ed.) c. 265, § 14, thus, by describing the consequences, of necessity including within the description of "maim" an assault with a dangerous weapon resulting in disfiguring, crippling or the infliction of serious or permanent injury, that is, any one or more of those consequences. And reading the governing statute as a whole (c. 265, § 14), it is obvious that the Legislature was conscious of the difference between mayhem and maiming since the statute provides in the first part, "Whoever, with malicious intent to maim

or disfigure, cuts out or maims the tongue, puts out or destroys an eye, cuts or tears off an ear, cuts, slits or mutilates the nose or lip, or cuts off or disables a limb or member, of another person, and whoever is privy to such intent, or is present and aids in the commission of such crime . . . shall be punished . . .," and then disjunctively provides as first set forth above. Manifestly in the present case proof of any of the acts defined in the first part of the statute is not essential to the proof of maiming by the defendant as defined in the last part of the statute. See *State* v. *McDonie,* 89 W. Va. 185, 196. As used in the governing statute, the word "maim" has no technical meaning, *Commonwealth* v. *Newell,* 7 Mass. 245, and should be construed in its plain ordinary sense, and as usually defined the phrase "with intent to maim" means the infliction of some serious bodily injury. *State* v. *Foster,* 281 Mo. 618, 627. The word "maim" has been defined more widely in early use as meaning to disable, wound, cause bodily hurt or disfigurement to the body. In the light of the evidence the defendant must be taken to have intended the natural and probable consequences of his acts. The word "cripple" has been defined as meaning to deprive of the use of a limb, particularly of a leg or foot, to lame, to deprive of strength, activity, or capability for service. See *Baker* v. *Chicago, Burlington & Quincy Railroad,* 327 Mo. 986, 1010. And so a crippling may be found under the third part of the definition even though there may be complete recovery in time. There was evidence that presented the question for the jury whether, by the injuries inflicted upon the complainant, she was crippled for the time being as a result of consequent impaired ability to walk freely, or to sit at ease. See *Gustafson's Case,* 303 Mass. 397, 399; *People* v. *Lockwood,* 308 Mich. 618, 622. No error is disclosed in the assignments which we have just considered.

Assignment 60 is based upon an exception to the refusal of the judge to instruct the jury that the burden was on the Commonwealth to prove beyond a reasonable doubt that the complainant did not inflict the injury on herself. There was no error. The burden was on the Common-

wealth to prove beyond a reasonable doubt that the defendant committed the acts complained of in the indictments.   It was a necessary corollary to such proof that the jury be satisfied beyond a reasonable doubt that no one else committed the acts.   *Commonwealth* v. *Trefethen*, 157 Mass. 180, 185.   The judge, however, was not bound to refer specifically to all the elements implicit in sustaining the burden resting on the government.   The charge in general terms dealt fully and correctly with the doctrine of burden of proof beyond a reasonable doubt, and this was all that was necessary.   *Commonwealth* v. *Hughes*, 183 Mass. 221, 228.   See *Commonwealth* v. *Derby*, 263 Mass. 39, 47; *Commonwealth* v. *Bartolini*, 299 Mass. 503, 514 (certiorari denied sub nomine *Bartolini* v. *Massachusetts*, 304 U. S. 565).

Assignments 62, 63, 64 and 65.   These assignments are based upon exceptions to the refusal of the judge to instruct the jury that (1) the burden was on the Commonwealth to prove beyond a reasonable doubt that the complainant did not consent to any assault; (2) an assault consented to is not an assault in law unless it involves a breach of the public peace or is of a nature that the law says cannot be justified by the consent of the assaulted party; (3) there was no evidence here of any breach of the public peace; and (4) a person cannot in law consent to an assault that seriously and unreasonably endangers life according to common experience; if it was found that there was an assault committed by the defendant on the complainant that did not seriously and unreasonably endanger life according to common experience and it was further found that the complainant consented to the assault, the verdict would be "not guilty" on indictment No. 1812 and on both counts of indictment No. 1811.   The jury could have found properly that the assaults upon the complainant by the defendant of which he was found guilty were of such violence that they resulted in bodily harm.   It is settled that to commit a battery upon a person with such violence that bodily harm is likely to result is unlawful, and consent thereto is immaterial.   *Commonwealth* v. *Parker*, 9 Met. 263, 265. *Commonwealth* v. *Collberg*, 119 Mass. 350.   *Commonwealth*

v. *Pierce,* 138 Mass. 165, 180. See *Rex* v. *Taverner,* 1 Rolle, 360; Co. Lit. 127b; *Rex* v. *Rice,* 3 East, 581; *Regina* v. *Alison,* 8 C. & P. 418; *Regina* v. *Bradshaw,* 14 Cox C. C. 83, 84–85; *The Queen* v. *Coney,* 8 Q. B. D. 534; *The King* v. *Donovan,* [1934] 2 K. B. 498, 507. And in the case last cited the court said at page 509, "For this purpose we think that 'bodily harm' has its ordinary meaning and includes any hurt or injury calculated to interfere with the health or comfort of the prosecutor. Such hurt or injury need not be permanent, but must, no doubt, be more than merely transient and trifling."

Assignment 66 is based upon an exception to the refusal of the judge to instruct the jury "If you find on all the evidence that the defendant committed any assault on Helen Stavrou and you further find that at the time he committed it he was so far intoxicated as to be unable to form a guilty intent your verdict will be 'not guilty.'" The requested instruction was not correct in law and was properly refused. As is said in *Commonwealth* v. *Hawkins,* 3 Gray, 463, 466: "The rule of law is, that although the use of intoxicating liquors does to some extent blind the reason and exasperate the passions, yet, as a man voluntarily brings it upon himself, he cannot use it as an excuse, or justification or extenuation of crime. A man, because he is intoxicated, is not deprived of any legal advantage or protection; but he cannot avail himself of his intoxication to exempt him from any legal responsibility, which would attach to him, if sober." To the same effect see *Commonwealth* v. *Malone,* 114 Mass. 295, 298; *Commonwealth* v. *Gleason,* 262 Mass. 185, 191; *Commonwealth* v. *Taylor,* 263 Mass. 356, 363. The instant case does not present any question of deliberate premeditation as in cases of first degree murder. *Commonwealth* v. *Parsons,* 195 Mass. 560, 571. It may be added that the instruction given by the judge to the jury as to this subject matter was sufficiently favorable to the defendant.

Assignment 67 is based upon an exception to the refusal of the judge to give the following instruction: "The presumption which arises from the uniform conduct of men

and women under a given state of facts enters essentially into almost every cause to be tried. Very few cases are established by positive proof. If the fact, alleged by one party and denied by the other, be unusual, unaccountable, and not warranted by the circumstances which attended the transaction, it will not be likely to obtain credit with a jury." There was no error. To have given the instruction would have been an invasion of the jury's prerogative by the trial judge. *Commonwealth* v. *Dower,* 4 Allen, 297, 300.

Assignments 7 and 46. These assignments are based upon exceptions to the admission of testimony of the witness Ellis J. Whelan and to the refusal to strike out that testimony. The complainant testified that the first thing that she did when she arrived at the South Station was to send a telegram. The defendant objected, but took no exception to the judge's ruling that the fact that she sent a telegram was admissible but that the contents were not. Upon objection the judge excluded the name of the addressee of the telegram. A copy of the telegram was marked for identification. Whelan, who was manager of the commercial service department and keeper of the records of the Western Union Telegraph Company, was permitted to testify over the defendant's objections that the telegram in question was sent by someone named "Helen" to Mrs. Charles Maraventano, 157 Seymour Street, Auburn, New York.

The defendant has argued that the testimony of the witness Whelan was not of his personal knowledge and was therefore hearsay. That is true, but that evidence had no material bearing on the issues in the case and its admission cannot be said rightly to have been prejudicial to the defendant. *Commonwealth* v. *Noxon,* 319 Mass. 495, 540–541.

Assignments 8 and 10. These assignments are based upon exceptions to the exclusion of answers of the Commonwealth's experts and defence experts to certain hypothetical questions. Dr. Alan R. Moritz, called by the Commonwealth, on cross-examination was asked: "Have you an opinion, Doctor, as to whether a person who had from fifty-one to fifty-three third degree burns inflicted on them in a

space of seventeen hours could stand that pain without making an outcry?" He replied that he had an opinion, but on objection it was excluded.

Dr. Robert H. Aldrich, a witness for the defendant, on direct examination was asked: "Assume that the subject received fifty-one or fifty-four separate burns, either of second or third degree intensity, of the size from one quarter to three eighths of an inch in diameter, one by one, during a period from 6:30 P.M. one night until 10:30 A.M. the next morning, have you an opinion as to whether the subject could stand the pain of those burns without making an involuntary outcry?" Upon objection the question was excluded and the defendant made the following offer of proof: "I expect to show that in his opinion the subject would have screamed unless she was under an anesthetic or unless she was inclined to be masochistic."

There was no error. The matter was one that could easily be comprehended by a jury without the aid of expert testimony. *Commonwealth* v. *Spiropoulos*, 208 Mass. 71, 72. *Lynch* v. *C. J. Larivee Lumber Co.* 223 Mass. 335, 340. *Young* v. *Kaplan*, 267 Mass. 152, 156–157. *Johnson* v. *Orange*, 320 Mass. 336, 338.

Assignment 45 is based upon an exception to the exclusion by the judge of the official time table of the New York Central System effective March 1, 1946. The time table was offered in evidence by counsel for the defendant who made no offer of proof upon its exclusion by the judge. It, therefore, does not appear what the expected evidence was. *Commonwealth* v. *Bingham*, 158 Mass. 169, 171. *Commonwealth* v. *Perry*, 254 Mass. 520. *Commonwealth* v. *Pelletier*, 264 Mass. 221, 225.

Assignments 33 and 34 are based upon exceptions to the exclusion of testimony by two witnesses concerning an incident that occurred at Westover Field on April 5, 1946, when the complainant was present. There was no error. The evidence was offered by the defendant to contradict in some details the testimony of the complainant concerning the incident, which had been adduced from her on behalf of the defendant in cross-examination. The facts involved

were collateral and immaterial to the issues in the case and accordingly the defendant was bound by her testimony. *Commonwealth* v. *Buzzell*, 16 Pick. 153, 157–158. *Shurtleff* v. *Parker*, 130 Mass. 293, 297. *Alexander* v. *Kaiser*, 149 Mass. 321, 322. *Commonwealth* v. *Smith*, 162 Mass. 508, 509. *Chalmers* v. *Whitmore Manuf. Co.* 164 Mass. 532, 535. *Fisk* v. *Fisk*, 263 Mass. 34, 36–37. Wigmore on Evidence (3d ed.) § 1021.

Assignment 39 is covered by what we have just said in the consideration of assignments 33 and 34.

Assignment 19 is based upon an exception to the action of the judge in striking out testimony given by a witness for the defendant that the complainant had a bad reputation in Manchester, New Hampshire, for morality and chastity. On cross-examination the witness was examined at length as to her understanding of the meaning of the word "chastity." She was also questioned with care by the judge as to this matter. The record discloses that she had but an indefinite and inadequate understanding of the meaning of that word. In these circumstances we are of opinion that the action of the judge in striking out the testimony in question cannot be said to have been erroneous.

*Judgments affirmed.*