UNITED STATES, Appellee,

v.

Paul VIDAL, Private First Class, U.S. Army, Appellant.

No. 49,957.
CM 443794.

U.S. Court of Military Appeals.

Feb. 24, 1987.

For Appellant: Captain Bernard P. Ingold (argued); Colonel William G. Eckhardt, Lieutenant Colonel Arthur L. Hunt, Captain Thomas J. Feeney (on brief); Colonel Brooks B. La Grua, Lieutenant Colonel William P. Heaston, Lieutenant Colonel Paul J. Luedtke, Major Eric T. Franzen and Captain Lorraine Lee.

For Appellee: Captain Stephen B. Pence (argued); Colonel James Kucera, Lieutenant Colonel Adrian J. Gravelle, Lieutenant Colonel Joseph A. Rehyansky, Captain Dean C. Berry (on brief); Captain John J. Park, Jr. and Captain Kurt J. Fischer.

*Opinion of the Court*

EVERETT, Chief Judge:

A general court-martial composed of officer and enlisted members tried appellant at Kaiserslautern, Federal Republic of Germany, on charges of rape and kidnapping, in violation of Articles 120 and 134 of the Uniform Code of Military Justice, 10 U.S.C. §§ 920 and 934, respectively. Contrary to his pleas, Vidal was convicted of both charges and was sentenced to a dishonorable discharge, 10 years' confinement, total forfeitures, and reduction to the grade of E-1. The convening authority approved these results; and the Court of Military Review affirmed the findings and sentence. 17 M.J. 1114 (1984). We granted review of these issues:

I

WHETHER THE PROPHYLACTIC RULE OF EDWARDS V. ARIZONA IS TRIGGERED BY A REQUEST FOR COUNSEL DIRECTED TO GERMAN POLICE WHO ARE INVESTIGATING A CRIME WITH THE ACTIVE COOPERATION OF AMERICAN MILITARY POLICE.

II

WHETHER THE APPELLANT WAS PREJUDICED BY THE FAILURE OF THE MILITARY JUDGE TO REQUIRE THE PROSECUTION OR THE MEMBERS TO ELECT WHETHER APPELLANT WAS A PERPETRATOR OR AN AIDER AND ABETTOR.

*Factual Background*

Fraulein Andrea Blum testified that she was a student at the University in Germersheim, Germany, and that on August 30, 1982, she had gone with her boyfriend, Roland Mueller, to a tavern in that city. After the couple had drunk beer for a while and had gone to a second tavern, they started to walk back to her apartment. A large American-made automobile stopped near them, and a black man exited from the passenger side. Suddenly, he grabbed Andrea and, despite her screams and struggling, dragged her into the car. She hit him and kicked the windshield so hard that it cracked. He then struck her in the face and pressed her face into the dashboard. Andrea begged her assailant and the driver to let her out; but they refused. They drove a few kilometers to a wooded area near Sonderheim, a neighboring town. She was pulled into the back seat, and the passenger proceeded to have intercourse with her. According to Andrea, she did nothing to encourage him; but she did not actively resist because of his having beaten her when she had tried earlier to free herself. "I was very afraid," she testified. "I just thought to myself just be calm and quiet so that I don't get killed."

After the passenger had inserted his penis into her vagina, she pretended to have an orgasm in the hope that this would shorten her ordeal. Subsequently, the driver climbed into the back seat and inserted his penis. She begged him several times not to kill her; and finally he with-

drew. Thereafter, the two men drove elsewhere; and the passenger forced her out of the car, and she walked to a friend's home.

Meanwhile, Mueller had reported the incident to the German police in Germersheim. Also, Siegbert Kopp, a pedestrian, informed the police that shortly after 9:00 p.m. he had noticed a distinctive American car in which a woman had been struggling with a man and screaming in fear.

As a result of information they received from Mueller, Kopp, and later from Andrea, the German police commenced an investigation, which led quickly to appellant and to a fellow soldier, Tyrone Hunt. Early in the morning of August 31, they apprehended the two men at their barracks; and immediately American military police were summoned. Upon arriving at the barracks and learning of the serious accusations against the two soldiers, one of the military policemen, Specialist Four Thomas Buggy, advised Vidal verbally that he had the right to remain silent and to get a lawyer. However, Buggy was not an interrogator and did not attempt to elicit a waiver of rights or to initiate an interrogation. Vidal seemed to understand his rights but did not respond to Buggy's advice.

Subsequently, still early in the morning of August 31, the German police transferred Vidal and Hunt from their barracks to the German police station at Germersheim. The two military policemen followed in a separate automobile. After Vidal arrived at the police station, the German police authorities decided to administer a blood-alcohol test. Helmuet Seiter, a German police officer, took Vidal to a hospital for this purpose; but the military policemen did not accompany them.

Prior to administering the blood-alcohol test, Herr Seiter informed appellant of his rights under German law with respect to such tests. In giving this advice, Seiter used a document of which the top half is in English and begins with a recital that the person to be questioned has been informed that the interrogator wishes to question him about a crime "of which" he is "ac-cused or suspected." A blank had been filled to inform Vidal that kidnapping was the suspected offense.

Then the recital continues:

I understand that I have the right to remain silent and that any statement I make may be used as evidence against me in a criminal trial.

I understand that I have the right to consult with counsel and to have counsel present with me during questioning. I may retain counsel at my own expense or counsel will be appointed for me at no expense to me. If I am subject to the Uniform Code of Military Justice, appointed counsel may be military counsel of my own choice if he is reasonably available.

I understand that even if I consent to being questioned now without having counsel present, I may stop answering questions at any time. Also, I may request counsel at any time during questioning.

The form next contains a place for the suspect to indicate whether he wants counsel and whether he consents to being questioned. Vidal had marked the document to indicate both that he wanted counsel and that he did not "consent to being questioned." The bottom half of the form, which was not filled in, contains a German translation of the same information about the suspect's rights which appears in English at the top of the form.

After the blood-alcohol test had been administered, Vidal was returned to the German police station, where, at about 4:30 a.m., Special Agent Jeffrey Zwemke of the Criminal Investigation Command (CID) arrived to investigate for the American military authorities. Specialist Four Buggy and Herr Seiter briefly informed Zwemke of the suspected crimes, but neither told him that Vidal had asserted his right to counsel to the German police. Indeed, Buggy was unaware of this fact. Special Agent Zwemke proceeded to advise Vidal of his right to remain silent and his right to counsel. Appellant waived these rights and made a statement. Therein, he admit-

ted that he had driven the car with Hunt as his passenger; after a girl had gotten into the front seat of the car and they drove off, she had started to fight; they had driven to a wooded area, where he parked; the girl had tried to run but Hunt had caught her; and Hunt and Vidal had intercourse with her.

Appellant moved unsuccessfully to suppress this statement. In overruling his motion, the military judge found that: (1) Vidal had made no "claim of rights to Specialist Four Buggy"; (2) "the German Police read the accused's rights concerning questions in connection with a blood alcohol test"; (3) Special Agent Zwemke was not informed in any way that Vidal "had been advised of his rights"; (4) Vidal "waived his rights" to Zwemke; and (5) his "statement was voluntary" and "not the result of ... coercion, threats, unlawful promises, or inducements, or psychological coercion."

Appellant's testimony in his own defense at trial conformed generally to his pretrial statement to Special Agent Zwemke. His version was that Andrea Blum had voluntarily entered the car but had started to resist as soon as he drove away and that she had bitten and kicked Hunt and broken the windshield. Also, he had seen Hunt strike her in the face with his "right hand and his closed left fist." She had said, "Kill me or let me out"; but he kept on driving. They drove to a "wooded area" outside of town where Hunt moved Andrea into the back and had sexual intercourse with her. Apparently, she had an orgasm. Hunt had then invited Vidal to have intercourse with the girl; and he did so. However, he thought she had consented to the intercourse with him because (a) she appeared to enjoy intercourse with Hunt; (b) after having intercourse with her, Hunt had told him to "go ahead"; and (c) when Vidal climbed in the back seat with his trousers down, she had groaned in a manner which he construed as an indication of pleasurable anticipation.

After the evidence was all in, the military judge discussed his proposed instructions with counsel and mentioned that it appeared that the Government had proceeded on the premise that Vidal was a principal, rather than an aider and abettor. The trial counsel disagreed and pointed out that "Vidal was an aider and abettor" of a "rape committed by PFC Hunt." The defense objected to any instruction on an aider-or-abettor theory on the ground that it had not been covered by the rape allegations and that the evidence had focused on whether Andrea Blum had given her consent to intercourse with Vidal. Despite the defense objection, the military judge ultimately instructed the court members in a manner that allowed them to convict Vidal of rape if either he had perpetrated it himself or had aided or abetted the commission of the offense by Hunt. The judge did not instruct the members to consider separately whether appellant was guilty of rape as a perpetrator or as an aider and abettor.

### Issue I

Under the rule established in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), an investigator must terminate custodial interrogation if the suspect requests counsel. Unless the suspect himself "initiates" a further generalized discussion, the questioning cannot be resumed until counsel has been made available. *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). The interrogation cannot be resumed even if the request for counsel was made to an investigator other than the person who seeks to interrogate the suspect. Imputation of knowledge of the request for counsel has taken place even when the interrogator was a member of a police agency different from that of the person to whom the request was made.

Thus, after remand from the Supreme Court, *see Goodson v. United States*, 471 U.S. 1063, 105 S.Ct. 2129, 85 L.Ed.2d 493 (1985), we ruled that a statement to a military police investigator should have been excluded from evidence because, prior to the taking of the statement, the accused had made a request for counsel to the military policeman who had apprehended

him.[1] Similarly, in *United States v. Reeves*, 20 M.J. 234 (C.M.A.1985), we held that, because of an earlier request for counsel made to an investigator, the accused's statements to his company commander were inadmissible unless they had been initiated by the accused.[2] In other cases, as well, knowledge of a suspect's request for counsel has been imputed to other investigators and investigating agencies. *See, e.g., United States v. Harris*, 19 M.J. 331, 339 (C.M.A.1985); *United States v. Scalf*, 708 F.2d 1540, 1544 (10th Cir. 1983).

Clearly, if Herr Seiter had been an American investigator—rather than a German police officer—the request for counsel made to him would have precluded the subsequent interrogation by Special Agent Zwemke and would have rendered inadmissible the statement which Zwemke obtained from appellant. However, the fact remains that Seiter was a German investigator and was conducting an investigation initiated by German authorities in response to acts which violated German law and of which a German national was the victim.

■ Generally, the actions and the knowledge of officials of a foreign nation are not imputed to American authorities in connection with the application of American constitutional guarantees. Thus, in *United States v. Morrison*, 12 M.J. 272 (C.M.A.1982), we refused to apply the exclusionary rule to a search by German police which had not been instigated or participated in by American officials. Also, we ruled there that the presence of American military personnel during the search did not of itself constitute participation. *See also* Mil.R.Evid. 311(c)(3), Manual for Courts-Martial, United States, 1969 (Revised edition). Although there are obligations of mutual assistance under the NATO Status of Forces Agreement, we have concluded that nonetheless the investigators in the host country cannot be considered as simply an extension of American investigative activity and that admissibility of the evidence seized by them is not to be tested by American constitutional standards. *Cf. United States v. Ravine*, 11 M.J. 325 (C.M.A.1981); *United States v. Jones*, 6 M.J. 226 (C.M.A.1979); *see also United States v. Mundt*, 508 F.2d 904 (10th Cir.1974), *cert. denied*, 421 U.S. 949, 95 S.Ct. 1632, 44 L.Ed.2d 103 (1975); *United States v. Welch*, 455 F.2d 211 (2d Cir.1972); *United States v. Nagelberg*, 434 F.2d 585 (2d Cir.1970), *cert. denied*, 401 U.S. 939, 91 S.Ct. 935, 28 L.Ed.2d 219 (1971). Since the investigation by Herr Seiter should not be viewed as an investigation in behalf of American authorities, we see no reason to impute his knowledge of appellant's request for counsel to Special Agent Zwemke.

■ Even if Zwemke had been personally aware of the request for counsel made to German authorities, we do not believe that this knowledge would have precluded him from questioning Vidal. In this regard, we reason that a request for counsel made in connection with a foreign investigation may result only from the American suspect's unfamiliarity with the foreign legal system and does not necessarily mean that the suspect is unwilling to talk to an American investigator until he has been provided counsel. The suspect is adequately protected if he is warned of his rights under American law when first questioned by American officials. In short, we conclude that the requirements of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, are not triggered by a request for counsel made to a foreign official.

---

1. *United States v. Goodson*, 22 M.J. 22 (C.M.A.), *pet. for recon. denied*, 22 M.J. 247 (C.M.A.1986). *See also United States v. Goodson*, 14 M.J. 542 (A.C.M.R.1982); *United States v. Goodson*, 18 M.J. 243 (C.M.A.1984); and *United States v. Goodson*, 22 M.J. 947 (A.C.M.R.1986) (holding, on remand, that the accused's subsequent statement to his company commander was also inadmissible.)

2. *See also United States v. Reeves*, 21 M.J. 768 (A.C.M.R.1985), which on remand determined that the statements were inadmissible; and *United States v. Reeves*, 21 M.J. 391 (C.M.A. 1985) (summary disposition after A.C.M.R. decision on remand).

■ In the present case, we are somewhat puzzled by the German police officer's use of a form which refers to the Uniform Code of Military Justice and the appointment of military counsel. Indeed, we are unsure under what circumstances military counsel would be made available to advise an American servicemember who is being interrogated by foreign investigators. Moreover, if the foreign investigator was only seeking to perform a blood-alcohol test, there would be no right to counsel or any privilege against self-incrimination available under American law, since the extraction of a body fluid does not involve testimonial compulsion and so is not within the purview of the Fifth-Amendment guarantee against self-incrimination. *See Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *Murray v. Haldeman*, 16 M.J. 74 (C.M.A.1983).[3] Despite our uncertainty as to the reason for the choice of the particular phraseology in the form, it was being used by German officials solely in connection with their investigation; and we do not believe that its use altered the nature of the investigation in a way that would cause *Edwards* to apply. Accordingly, we hold that the military judge acted properly in denying the motion to suppress.

## Issue II

■ Appellant was charged with raping Andrea Blum; but the allegations do not indicate whether he was the perpetrator or only an aider and abettor to Hunt's actions. However, the standard-form specification of rape was sufficient to charge either theory; and even though the Government may initially proceed on one theory, it is entitled to utilize the alternative theory of guilt before the members. *See, e.g., United States v. Brooks*, 22 M.J. 441, 444 (C.M.A.1986). In a rape case, if several persons are holding the victim, it makes no difference whether a particular accused had intercourse with her; for he may be convicted as an aider and abettor. Like-

wise, in a homicide prosecution, if the victim was killed by a shot when several persons were shooting at him, it is immaterial whether the Government proves that the accused fired the fatal shot or was only part of the crowd which was shooting at the victim.

■ Under such circumstances it has not heretofore been required that two-thirds of the members agree as to the particular theory of liability. *Cf. United States v. Lomax*, 12 M.J. 1001, 1004–05 (A.C.M.R.), *pet. denied*, 13 M.J. 467 (1982); *United States v. Clements*, 12 M.J. 842, 845 (A.C.M.R.), *pet. denied*, 13 M.J. 232 (1982). And we do not believe now that such a requirement need be imposed in order to fulfill the statutory mandate that two-thirds of the court-martial members must concur in a finding of guilty. Art. 52(a)(2), UCMJ, 10 U.S.C. § 852(a)(2). *Cf. United States v. Barton*, 731 F.2d 669 (10th Cir.1984). If one-third of the members are satisfied that the accused personally fired the shot and another third find that he aided someone else in doing so, he can properly be convicted of murder, because two-thirds of the court members are convinced beyond a reasonable doubt that the accused, on one theory or another, committed murder at the particular time and place. Likewise, if several persons are acting to overcome a woman's resistance to sexual intercourse, but only one of them actually has such intercourse, the Government can still convict an accused, even though it cannot prove beyond a reasonable doubt whether he personally had intercourse or only helped someone else have intercourse with the unwilling victim.

The present case, however, goes beyond the selection of a theory for holding an accused guilty for a single injury or result. Here, instead, there was evidence of two acts of penetration—the first by Hunt and the second by Vidal. As to the former, appellant was liable—if liable at all—only

---

3. Probably, the warning is with respect to questions asked incident to the blood test (*e.g.,* what has the suspect drunk and when?).

on a theory of aiding and abetting. As to the latter, he was criminally liable as a perpetrator, if liable at all.

The defense contends that, under these circumstances, the prosecution should be required to elect between the two alternatives for convicting of rape. Otherwise, the accused will be confused in defending himself; and the court members may themselves be confused. In this connection, appellate defense counsel points out that appellant had available a defense of mistake with respect to any government claim that he personally had raped Andrea Blum; but he did not assert this defense as to the aiding-and-abetting charge.

■ We recognize that usually where several similar but separate offenses are involved, the judge should require the prosecution to elect which offense is being prosecuted. Otherwise, an accused may have difficulty in preparing his defense; may be exposed to double jeopardy; and may be deprived of his right to jury concurrence concerning his commission of the crime. *See People v. Estorga,* 200 Colo. 78, 612 P.2d 520 (1980); *Burlison v. State,* 501 S.W.2d 801 (Tenn.1973). However, an election has not been required where offenses are so closely connected in time as to constitute a single transaction. *See, e.g., Commonwealth v. Farrell,* 322 Mass. 606, 78 N.E. 2d 697, 702 (1948) ("substantially continuous felonious assaults"); *Aumada v. State,* 657 S.W.2d 890, 892 (Tex.App. 1983) ("several acts of rape ... committed by one continuous act of force and threats"); *Watson v. State,* 184 Tenn. 177, 197 S.W. 2d 802, 806 (1946) ("continuous criminal action"); *People v. Mota,* 115 Cal. App.3d 227, 171 Cal.Rptr. 212 (1981) ("many continuous acts of forced sexual intercourse").

■ In this case, the interval between the two acts of sexual intercourse was very brief. The location was the same—namely, the parked car. The victim was the same. The penetration of the victim by Hunt and Vidal's subsequent intercourse with her were part of a continuous transaction.

If there had been evidence that appellant had personally engaged in the two acts of intercourse as part of a continuous transaction, the Government could not have been compelled to elect between them; nor would the defense have been entitled to an instruction that two-thirds of the court members must agree that a particular act of intercourse had occurred. In this case, any liability of appellant for the first act of intercourse was vicarious—as an aider and abettor. However, Article 77, 10 U.S.C.A. § 877 abolishes the distinction between principals and aiders-and-abettors; and, according to the language of that Article, if appellant aided Hunt, he was a "principal." *See United States v. Varraso,* 21 M.J. 129 (C.M.A.1985), *cert. denied,* 106 S.Ct. 1645, 90 L.Ed.2d 90 (1986). This being so, we see no significance in the circumstance that Hunt, rather than Vidal, first penetrated the victim. *Cf. Watson v. State* and *Aumada v. State,* both *supra.*

If two-thirds of the members of the court-martial were satisfied beyond a reasonable doubt that at the specified time and place, appellant raped Andrea Blum—whether he was the perpetrator or only an aider and abettor—the findings of guilty were proper. It makes no difference how many members chose one act or the other, one theory of liability or the other. The only condition is that there be evidence sufficient to justify a finding of guilty on any theory of liability submitted to the members. That condition was amply satisfied in this case. Indeed, in light of the Government's evidence and Vidal's own admissions, the members probably were persuaded that he was criminally responsible for both acts of intercourse.

In a different context—that of multiplicity of charges—we have emphasized that a single transaction should not be divided into numerous separate components. We need not decide whether the two separate acts of intercourse could properly have been alleged as two separate rapes. How-

ever, certainly we shall not penalize the Government because it did not allege two separate rapes.

### Decision

Appellant's pretrial statement to Special Agent Zwemke was properly admitted. The military judge properly declined to compel the Government to elect between theories of liability for the rape of Andrea Blum.

The decision of the United States Army Court of Military Review is affirmed.

Judge SULLIVAN did not participate.

COX, Judge (concurring):

I write merely to make it clear that my views concerning "imputing knowledge" of requests for counsel as expressed in *United States v. Harris*, 19 M.J. 331, 342 (C.M. A.1985), remain unchanged.