**UNITED STATES, Appellee,**

v.

**Specialist Four Ronald L. COLEMAN, 431–25–0988, United States Army, Appellant.**

**ACMR 8600871.**

U.S. Army Court of Military Review.

30 Nov. 1987.

---

For appellant: Captain Alfred H. Novotne, JAGC (argued), Captain David C. Hoffman, JAGC (on brief).

For appellee: Captain Bryant G. Snee, JAGC (argued), Colonel Norman G. Cooper, JAGC, Lieutenant Colonel Gary F. Roberson, JAGC, Major Kathryn F. Forrester, JAGC (on brief).

Before COKER, KENNETT and ROBBLEE, Appellate Military Judges.

## OPINION OF THE COURT

COKER, Senior Judge:

Contrary to his pleas, appellant was convicted by a military judge sitting as a general court-martial of the offenses of assault

and battery on a child under the age of sixteen, aggravated assault, and murder in violation of Articles 128 and 118, Uniform Code of Military Justice, 10 U.S.C. §§ 928, 918 (1982) [hereinafter UCMJ]. The victim in each instance was appellant's two and one-half month old daughter. His sentence of a dishonorable discharge, confinement for five years, total forfeitures, and reduction to Private E–1 was approved by the convening authority.

As the child's death occurred in civilian housing in the Federal Republic of Germany, both the German police and the United States Army Criminal Investigation Command [hereinafter CID] conducted an investigation. During the investigation, appellant made an oral admission to the German police and then invoked his rights under German law to make no further statement and to request an attorney. Subsequently, the CID, with full knowledge that appellant had requested an attorney of the German police, interviewed him, secured a waiver of his rights under Article 31, UCMJ, 10 U.S.C. § 831, and obtained a written statement from him. The defense motion to suppress the statement was denied and the statement was admitted into evidence. Appellant argues that the statement was inadmissible for two reasons: first, that the interrogation by the CID was barred by *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) and second, that his request for counsel to the German police was binding upon the CID because the investigation was conducted jointly. We disagree.

The issue of whether a United States agent is bound under *Edwards* by his knowledge that an accused made a request for an attorney to a foreign government official is one of first impression for this court.[1] It involves not only the interplay of Fourth and Fifth Amendment rights under the United States Constitution, but also the

application of constitutional rights of United States military personnel within the legal system of a foreign, sovereign nation. A factual exposition is necessary for clarity.

The victim had an extensive history of medical problems starting with her premature birth in mid-May 1986. On one occasion in mid-July, the examining physician initially suspected child abuse; however, the appellant provided a satisfactory explanation for the child's injuries and the issue was dropped. The child was dead on arrival at the hospital on the afternoon of 28 July 1986. The autopsy on 30 July revealed two major attacks on the child: nine broken ribs that were old injuries, and a skull fracture and head injuries that were the immediate cause of death. In addition, it revealed other minor contusions of varying age. These findings correspond to the charges against appellant: aggravated assault during the period of 27 May to 15 July, assault and battery during the period of 15 July to 19 July, and murder during the period of 25 July to 28 July.

When informed on 29 July of the death, the CID notified the German police and made arrangements with them to go to appellant's home in the local German community later that day. The CID also informed appellant's commander, but made no request for a search authorization. A CID employee served as interpreter. At the home, appellant was told "we needed to talk to him and see the house." He allowed the group into the apartment. One CID agent and the German policeman inspected the home while the second CID agent talked with appellant. No advice or warning under Article 31, UCMJ, was given to him. Appellant indicated his daughter may have hit her head while in a portable, wind-up swing. The agent relayed this information to the German policeman who

---

1. In *United States v. Vidal,* 23 M.J. 319 (C.M.A.) *cert. denied,* —— U.S. ——, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987), the Court of Military Appeals stated: "Even if [the CID agent] had been personally aware of the request for counsel made to German authorities, we do not believe that this knowledge would have precluded him from questioning Vidal." 23 M.J. at 323. As this belief was not necessary to the decision in that case and was not given as a rule of the case, we consider it *dicta.* While the statement may not be binding precedent, it is persuasive particularly since the following paragraph of the Court's opinion raises some question regarding the possible motive of the German investigation.

then seized the swing as evidence, and requested the CID to hold the swing and bring it to the autopsy the following day. The German policeman further told appellant and his wife to come to the German police station the next morning.

The autopsy was performed on 30 July at a U.S. military medical facility. A U.S. military and a German pathologist conducted the procedure together. The cause of death was found to be blunt force injuries to the head, not natural causes. German police and CID personnel were present at the autopsy. Several photographs were taken of the child's body in the swing, to assist in determining if the head injuries could have been caused by the swing's mechanical operation.

At 0900 hours the same day, appellant and his wife were taken to the German police station by a member of his unit. On questioning by the police, they provided only vague information. They were required by the Germans to wait at the station until the autopsy results were available. A member of his unit took lunch to them. At 1300 hours, the German investigator confronted appellant with the autopsy findings and the inconsistencies of his statements. Appellant made an admission against his penal interest, but refused to make a written statement. He then declined to answer any further questions and requested an attorney. The interrogation was immediately terminated. Two CID agents picked up the Colemans at 1530 and took them to the CID office. No United States agent was present at the German police station during that day and none participated in any way with the Germans in their handling of appellant and his wife.

At the CID office, the Colemans were provided dinner. A CID agent began interviewing appellant at 1700 hours. The agent knew at that time that appellant had refused to make a written statement for the German police and that he had requested an attorney. Permission for the inter-

view had been obtained from the CID's judge advocate legal advisor. A complete advisement under Article 31, UCMJ, was given to appellant, who waived his rights and made a detailed written statement that contained admissions against his penal interest. He neither made request for nor mentioned an attorney. This is the statement at issue. At a previous time, probably on 29 July, a CID agent referred to the United States/German activity as a "joint investigation." The agent repeated this description at the pretrial investigation (required by Article 32, UCMJ), but refused to categorize it with that term at trial.

Before the trial court, as here, appellant argued that the investigation was "joint" and under United States military control; that the German police were the agents of the CID; and that, therefore, his request for counsel made to the German investigator was binding on the CID, and prohibited the CID from initiating any discussion with or questioning of him. Trial defense counsel objected to the photographs from the autopsy, including those showing the swing, on the bases of cumulativeness and their inflammatory nature. Manual for Courts–Martial, United States, 1984, Mil.R. Evid. 403. Eighteen of thirty-one photographs were excluded as requested. Defense counsel objected to admission into evidence of the swing as the result of an illegal search and seizure. As the government was not prepared to show the chain of custody on the swing, it withdrew its proffer of the swing as evidence.

Initially, we determine that the line of cases resulting in *United States v. Goodson*, 22 M.J. 22 (C.M.A.1986), are not directly applicable to this case.[2] First we must address the legal status under the Fourth Amendment of the activities at appellant's home on 29 July. Second is the application of *Edwards* and *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986) to foreign government officials.

---

**2.** This series of cases addresses the imputation of knowledge that an accused requested counsel from one United States government agent to another. *Goodson* (from military police to CID agent); *United States v. Reeves*, 20 M.J. 234 (C.M.A.1985) (from CID agent to company commander); *United States v. Harris*, 19 M.J. 331 (C.M.A.1985) (from military police to military police).

Last is the application of the Fifth Amendment to coordinated police activities of United States and foreign officials.

## I.

■ Based on findings of fact by the trial judge and the stipulation of facts by the parties, we find that the inspection of appellant's home on 29 July 1986 was not a search. An unexplained death of a United States citizen had occurred in a German community. The police officials of both countries were required by their laws and regulations to investigate the death for the purpose of determining its cause. At the time the police officials approached and entered appellant's home, he was not a suspect.[3] The failure of appellant to object to the admission of his statements to the CID at the home is persuasive that the interview was not "custodial interrogation." It further supports the trial judge's determination that appellant was not a suspect. No advice or warning in accordance with Article 31 was given appellant before the interview as none was required. If appellant was not a suspect under the Fifth Amendment, he could hardly have been a suspect under the Fourth Amendment.

■ Were the activity at appellant's home a search, it would be subject to the constraints of the Fourth Amendment. Mil.R.Evid. 311(c)(1) and (3). We acknowledge the full participation in this police activity by the CID,[4] in addition to the fact that the CID also conducted an investigation of its own. Therefore, the seizure of the swing was subject to Mil.R.Evid. 311 and the Fourth Amendment. *See United States v. Morrison*, 12 M.J. 272 (C.M.A. 1982). As the swing was not admitted as evidence in the case, no apparent prejudice or error resulted, even if the seizure was

illegal.[5] No objection was made to the use of the swing at the autopsy, nor was any Fourth Amendment objection made to the admission into evidence of the photographs of the swing. Therefore, even if the seizure was unlawful, any error regarding the photographs of the swing was waived. Mil.R.Evid. 311(d)(2)(A) and (C); *cf. United States v. Coffin*, 25 M.J. 32, 33–34 (C.M.A. 1987) (objection to admission of seized evidence may be made after pleas if good cause shown).

## II.

*Edwards v. Arizona* established that an accused person in custody who has expressed his desire to deal with the police only through counsel is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication. The right to counsel under the Sixth Amendment was long recognized within the Federal system and was applied to state action under the Fourteenth Amendment. *See Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed. 2d 799 (1963). *Edwards* recognized the pre-arraignment right to counsel under the Fifth Amendment and its application to state action under the Fourteenth Amendment. The Supreme Court has consistently recognized the importance of counsel under the Fifth and Sixth Amendments, even imposing on police "an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 485, 88 L.Ed.2d 481 (1985). It extended the *Edwards* rule on the right to counsel to apply in post arraignment situations in *Michigan v. Jackson, supra*. The Court of Military

---

**3.** The facts of record known to the CID that tend to support suspicion of a crime were the unfounded suspicion of child abuse on 19 July, the fact that the child had facial bruises, and the suspicion of a social work services staff member that there might have been child abuse. After hearing the witnesses and studying the parties' trial briefs, the trial judge found that appellant was not a suspect. As his determination is amply supported by the record, we accept that finding.

**4.** It matters not whether that participation is categorized as joint, cooperative, or coordinated.

**5.** We do not decide the lawfulness of this seizure. For purposes of argument, we will presume that it was unlawful.

Appeals has applied these constitutional protections as well as the protections of Article 31, UCMJ, to United States military actions. *See, e.g., United States v. Applewhite,* 23 M.J. 196, 198 (C.M.A.1987); *United States v. Goodson, supra.* Yet there are limits in the application of United States constitutional law to its citizens.

■ In *United States v. Jordan,* 1 M.J. 145 (C.M.A.1975), a rule was enunciated that the Fourth Amendment applied directly to foreign police activities involving United States military personnel. On reconsideration, the rule was modified, *United States v. Jordan,* 1 M.J. 334 (C.M.A.1976), to apply constitutional law to foreign state action only if United States personnel were present or had instigated or contributed to the foreign action. Subsequently, the "mere presence" portion of the rule was deleted by Mil.R.Evid. 311, and its deletion upheld by the court in *Morrison.* The non-application of the Fifth Amendment and Article 31, UCMJ, to foreign police action is analogous. *United States v. Vidal,* 23 M.J. at 323[6]; *United States v. Jones,* 6 M.J. 226 (C.M.A.1979); *see* Mil.R.Evid. 305(h)(2) (rights warnings not prerequisite to admission of statement resulting from interrogation by foreign officials, if interrogation not conducted, instigated, or participated in by United States agents); *United States v. Covington,* 783 F.2d 1052 (9th Cir.) *cert. denied,* — U.S. ——, 107 S.Ct. 117, 93 L.Ed.2d 64 (1986) (exclusionary rules of *Miranda*[7] and *Edwards* not applicable in U.S. courts if statements obtained by foreign officer in foreign country). *Compare* Mil.R.Evid. 311(c)(3) *with* Mil.R. Evid. 305(h)(2). In order to preserve a service member's constitutional rights and protections from United States action, the military courts have established two safeguards. First, the foreign action cannot be conducted, instigated, or participated in, by United States officials. Secondly, the foreign action cannot be used as a subterfuge to circumvent the constitutional protections otherwise afforded an accused. To insure that basic human rights are protected, it is further required that the foreign action in dealing with the service member not result in a statement obtained through coercion, unlawful influence or inducement, Mil.R. Evid. 305(h)(2), nor be shocking to the conscience.[8] *United States v. Jordan,* 1 M.J. at 338.

■ The rules thus established for our application of constitutional norms in a foreign country conform to the Supremacy Clause.[9] Under existing treaties with the Federal Republic of Germany,[10] the United States is required to assist in carrying out all necessary investigations into offenses involving the United States or members[11] of its force. NATO SOFA, Article VII, para. 6(a). The facts of the case before the court demonstrate the need for and the

---

**6.** Interestingly, this decision was appealed to the Supreme Court on the constitutional issue. *Certiorari was denied* — U.S. ——, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987).

**7.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**8.** In this regard, we find that the German authorities treated appellant appropriately and exerted no unlawful pressure upon him.

**9.** This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.
U.S. Const. art VI, cl. 2. See *United States v. Murphy,* 18 M.J. 220 (C.M.A.1984), for a discussion of this Article and the Fifth Amendment's application in a foreign nation.

**10.** Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces, 19 June 1951 (1953) 4 U.S.T. 1792 [hereinafter NATO SOFA].

**11.** The record establishes the status of appellant as a member of the force. It does not adequately address the status of his wife and child. Appellant went AWOL from 18 February 1986 to 15 March 1986 to return to the United States and bring his wife back to Germany. She did not enter Germany pursuant to military orders and probably was not, therefore, a member of the force. If not a member of the force, she was not entitled to any of the benefits of the Treaty, nor would she have any constitutional protections from German state actions. However, it appears that both police agencies treated her as a member of the force.

wisdom of the rules, the Treaty, and the Constitution. Mrs. Coleman and her daughter (the victim) were United States citizens living in a German community, in an apartment owned by a German citizen, and leased to her husband (appellant). Any criminal offense she committed would be subject exclusively to German jurisdiction.[12] Any crime committed in the home would be subject to German jurisdiction, although if committed by appellant, the United States would have concurrent jurisdiction. If the victim of appellant's offense was not a member of the force, Germany had the primary right to exercise jurisdiction; otherwise the United States had such primary right. On the morning of 29 July, there was no evidence that an offense had been committed. Subsequent to the autopsy on 30 July, it was known that an offense probably had been committed. It was not known at that time, prior to the CID interview of appellant and prior to his admission to the German police, *who* had committed the offense: Mrs. Coleman under German jurisdiction, or appellant under probable United States jurisdiction.

Clearly, the police agents of both nations were obligated under their own laws to investigate the victim's death. The two nations were obligated to each other by treaty to assist one another in this investigation. Yet the laws, rules, and restrictions of the two nations, for pretrial investigations and the trial of an accused, vary markedly. Each police agency was charged to investigate and prepare a case, *in accordance with its own law*. No more could the German police direct United States police action, and jeopardize the trial of appellant, than could the CID jeopardize the trial of Mrs. Coleman. Only by interactive, cooperative assistance could both police agencies fulfill their legal obligations to their nation and to the potential accused. This objective is precisely the goal of the rules in recognizing the obligations of a foreign legal system, of the Treaty in re-

quiring and committing to mutual assistance, and of the Constitution in mandating the supremacy of treaty commitments. We conclude that the United States Constitution and court decisions interpreting it do not apply to the actions of foreign police officials.

## III.

In reviewing United States police action in assisting foreign police officials, performed in observance of United States treaties and law, we do not disregard our constitutional norms. Rather, we will closely analyze any cooperative activity to distinguish the actions of United States officials from those of foreign officials, and apply our norms and law to any and all United States action.[13] We have previously determined that the activity of investigation at appellant's home was a United States action and applied our norms and law to that activity. In reviewing the activity at the German police station on 30 July, we find no United States action. Appellant's unit provided transportation to the station and a lunch for appellant and his wife while there. This was at most a cooperative act by the United States in response to a cooperative act by the German officials in allowing the Colemans to remain at home and "come" to the station rather than "arresting" and "taking" them to the station. We note that appellant himself had no means of transportation. The CID correctly picked him up from the station, as by that time, he was suspected of a serious offense. There is no evidence that any United States official instigated the German interrogation of appellant. There is ample evidence that the CID did not participate in or conduct any part of that interrogation. There is no evidence that any United States official performed any action that could be considered a subterfuge for obtaining a statement from appellant or his wife. Given these facts, there can be no other conclusion than that the activity at the German police station was solely German action to which United States law did

---

12. Even if she were a member of the force, she was not subject to United States criminal jurisdiction. *Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957).

13. Such scrutiny of United States action is also applied in federal courts. *United States v. Covington*, 783 F.2d at 1056.

not apply. As our law did not apply to the German action, the rule of *Edwards* had no trigger and could not attach to appellant's request for counsel made to the German police.

To apply any other rule, and not the *dicta* of *Vidal,* would be contrary to the purpose of the *Edwards* rule. As cautioned by the Supreme Court, "one set of state actors may not claim ignorance of ... another state action." *Michigan v. Jackson,* 106 S.Ct. at 1410. *Edwards* imposes a "bright-line" standard as a prophylactic rule to control police misconduct. Attaching the *Edwards* rule to a request for counsel made to foreign officials would not hinder such misconduct. Rather, it would invite "ignorance" by our police officials, and encourage subterfuge to insure that ignorance. The only methods available to United States officials to insure that there is no violation of the Fifth Amendment and the *Edwards* rule are not to permit foreign officials to interrogate a military accused or to permit the foreign government to dispose of all offenses by military personnel. The first alternative would be a direct affront to the sovereignty of the foreign nation as well as a violation of a United States treaty. The second would be contrary to the same treaty as well as the explicit direction of the United States Congress.

In conclusion, we find that the *Edwards* rule is not triggered by an invocation of the right to counsel before foreign officials in a foreign investigation. Moreover, we find that the German interrogation of appellant, the only part of the investigation pertinent to the issues raised, was in no way "conducted, instigated, or participated in" by the CID, and thus, was solely German action, to which our law does not apply.

The findings of guilty and the sentence are affirmed.

Judge KENNETT and Judge ROBBLEE concur.