[No. 67158-8-I.   Division One.   February 11, 2013.]

THE STATE OF WASHINGTON, *Respondent*, v. CESAR E. TROCHEZ-JIMENEZ, *Appellant*.

*Jennifer J. Sweigert* (of *Nielsen, Broman & Koch PLLC*), for appellant.

*Daniel T. Satterberg, Prosecuting Attorney*, and *Deborah A. Dwyer, Deputy*, for respondent.

¶1 APPELWICK, J. — Trochez-Jimenez seeks reversal of his conviction for second degree murder while armed with a firearm. The sole issue on appeal is whether the trial court erred in refusing to suppress his statements to King County detectives in Canada after waiving his *Miranda*[1] rights, when he had previously invoked his right to counsel under the Canadian Charter of Rights and Freedoms.[2] We affirm.

## FACTS

¶2 This appeal arises from Cesar Trochez-Jimenez's conviction for second degree murder of Mario Batiz-Castillo. Batiz-Castillo was involved in a months-long affair with Trochez-Jimenez's then girl friend, now wife, Lesli. Trochez-Jimenez does not dispute that he shot Batiz-Castillo. Rather, at trial, Trochez-Jimenez maintained that he shot Batiz-Castillo out of self-defense.

¶3 After shooting Batiz-Castillo, Trochez-Jimenez fled to Canada. Soon after, Vancouver Police Constable John Jeffrey arrested Trochez-Jimenez on suspicion of entering Canada illegally. Jeffrey advised Trochez-Jimenez of his right under the Canadian Charter to an attorney without charge and without delay.[3] Trochez-Jimenez requested an attorney and was transported to the Vancouver jail. Jeffrey did not put Trochez-Jimenez in contact with an attorney at that time. He was unable to say whether Trochez-Jimenez was ever able to consult an attorney. Trochez-Jimenez later

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] Canadian Charter of Rights and Freedoms, Part I of the Constitution Act, 1982, *being* Schedule B to the Canada Act, 1982, c. 10 (U.K.).

[3] Jeffrey read into the record the document he used to inform Trochez-Jimenez of his right to an attorney under the Canadian Charter:

"I am arresting you in this case with respect to your immigration status. It is my duty to inform you you have the right to retain and instruct counsel in private without delay. You may call any lawyer you want. There's a 24-hour telephone service available which provides a legal aid duty lawyer who can give you legal advice in private. This advice is given without charge, and a lawyer can explain the legal aid plan to you. If you wish to contact a legal aid duty lawyer, I can provide you with the telephone number."

testified that he was never provided access to a Canadian attorney.

¶4 Upon booking, Jeffrey ran Trochez-Jimenez's name through the police database. He discovered that Trochez-Jimenez was a suspect in a Seattle homicide and called the King County Sheriff's Office. He also notified Canadian immigration that Trochez-Jimenez may have entered Canada illegally. Jeffrey had no further contact with Trochez-Jimenez and never questioned him about the murder. He spoke with Trochez-Jimenez only about his presence in Canada.

¶5 After Constable Jeffrey's phone call, King County Detectives Thien Do and Raphael Crenshaw drove to Vancouver to interview Trochez-Jimenez about the murder. They arrived late that evening and were told that Trochez-Jimenez was being interviewed by "Canadian Customs."[4] Not until after midnight were the detectives allowed to interview Trochez-Jimenez, after he had already been in custody for six hours. Trochez-Jimenez's English is limited, so Constable Luis Ramirez helped translate for the King County detectives. Ramirez is a native Spanish speaker and often assists the Vancouver police with translating, though he is not certified as an interpreter.

¶6 Before the detectives interviewed Trochez-Jimenez, Ramirez read him his *Miranda* rights in Spanish from a standard King County form.[5] *Miranda*, 384 U.S. at 479. Trochez-Jimenez also read the Spanish-language form himself. He acknowledged his rights, signed the waiver portion, and agreed to talk with the detectives. Ramirez, Do, and Crenshaw all testified that Trochez-Jimenez appeared to understand his rights. When asked if he understood his right to have an attorney, Trochez-Jimenez responded,

---

[4] The record refers to "Canadian Customs" but this may be the Canadian Border Service Agency.

[5] The trial court concluded that no one told the detectives or Constable Ramirez that Trochez-Jimenez had previously asserted his Canadian right to counsel.

"Okay." He never asserted his right to remain silent or requested a lawyer.

¶7 Trochez-Jimenez then confessed to shooting Batiz-Castillo. He explained that he never intended to shoot Batiz-Castillo but wanted to intimidate him so he would leave Lesli alone. But, he admitted he was "furious" when he grabbed his gun in the moments before he confronted Batiz-Castillo. He added that, in the moment, he was "blinded."

¶8 Trochez-Jimenez was charged with one count of first degree murder while armed with a firearm.[6] Trochez-Jimenez moved to suppress his incriminating statements, alleging that the King County detectives failed to honor his request for counsel—both to Constable Jeffrey upon arrest and when he answered "Okay" upon being read his *Miranda* rights. Trochez-Jimenez acknowledged that he was given the *Miranda* form but testified that he did not read it, because of his nerves and poor reading skills. He also testified that his response, "Okay," meant he agreed to have an attorney. He said that he assumed he would have an attorney, because he requested one from the Canadian authorities.

¶9 The trial court denied his motion to suppress. The court found that Constable Ramirez was a credible witness and that he and Trochez-Jimenez were able to understand each other. Conversely, the court did not find Trochez-Jimenez to be a credible witness. The court explained that Trochez-Jimenez "testified that he did not understand his *Miranda* rights. This is not credible. The defendant lied during his testimony. Defendant is smart and more sophisticated than he portrays himself. He is also able to read better than he claims. Defendant clearly understood his *Miranda* rights." (Italics added.) The court found that Trochez-Jimenez was informed of his right to counsel more than once and

---

[6] He was also charged with one count of alien in possession of a firearm without a license. That charge is not the subject of appeal.

declined to assert that right. At no time did Trochez-Jimenez request counsel in the presence of Detectives Do and Crenshaw, or even Constable Ramirez. The court concluded that Trochez-Jimenez was "fully and completely advised of all of his *Miranda* rights, that he understood those rights completely and that he made a knowing, intelligent[,] and voluntary waiver of his rights." (Italics added.)

¶10 The court also concluded that invoking a right to counsel under the Canadian Charter does not amount to assertion of the right under the United States Constitution. The court explained that Trochez-Jimenez was told by Constable Jeffrey that he was under arrest for illegal immigration issues. It was "with regard to those issues that [Trochez-Jimenez] was advised of his Charter rights and asserted his right to counsel." The court went on to say that "[n]othing about the *Miranda* decision or its progeny requires suppression, because the defendant asserted a different right under a different document to an officer of a different jurisdiction than the United States." (Italics added.)

¶11 The State introduced Trochez-Jimenez's statement that he was "furious" when he shot Batiz-Castillo to show the requisite mens rea to convict for murder and rebut his claim of self-defense. The jury acquitted Trochez-Jimenez of premeditated first degree murder but found him guilty of second degree murder while armed with a firearm. Trochez-Jimenez requested a mitigated sentence of 146 months, arguing that the victim was "an initiator and a willing participant in this horrible incident." Instead, the trial court believed that Trochez-Jimenez lied about being threatened and being in fear of the victim. The court also found that Trochez-Jimenez acted out of rage and jealousy and showed no regret. As a result, the court sentenced him at the top of the standard range—294 months imprisonment. Trochez-Jimenez timely appealed.

## DISCUSSION

■ ¶12 Trochez-Jimenez argues that the trial court erred by failing to suppress his confession to King County detectives. Specifically, he disputes the trial court's conclusion of law that his request for counsel from Canadian authorities did not constitute a request for counsel in the Seattle murder investigation. Because he was not provided counsel, Trochez-Jimenez argues, his subsequent waiver was not knowing, intelligent, and voluntary. We review de novo a trial court's conclusions of law at a suppression hearing. *State v. Armenta*, 134 Wn.2d 1, 9, 948 P.2d 1280 (1997).

■ ■ ¶13 The Fifth Amendment privilege against compelled self-incrimination requires that custodial interrogation be preceded by advice to the accused that he has a right to remain silent and a right to counsel.[7] *Miranda*, 384 U.S. at 478-79; U.S. CONST. amend. V. The accused may waive his *Miranda* rights, so long as the waiver is knowing and intelligent. *Id.* at 475. If the accused invokes his right to counsel, interrogation must cease. *Id.* at 474. Police may not then resume interrogation until an attorney is present or the accused initiates further communication. *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981). If officers continue interrogation after the accused invokes his right to counsel, all resulting statements must be suppressed. *Id.* at 486-87.

¶14 As a threshold issue, Trochez-Jimenez asks us to presume that *Miranda* governs the admissibility of his statements, even though he is a noncitizen. The State points out that the United States Supreme Court has not yet definitively ruled on this issue. But, the State does not appear to contest the issue. Rather, the State concedes that

---

[7] Trochez-Jimenez also appeals based on the Washington Constitution's privilege against self-incrimination. CONST. art. I, § 9. Washington courts interpret the Fifth Amendment and the Washington Constitution's self-incrimination provisions equivalently. *State v. Easter*, 130 Wn.2d 228, 235, 922 P.2d 1285 (1996).

some federal courts have held that *Miranda* procedures apply to United States officials' custodial interrogation of a foreign national in a foreign country. *See, e.g.*, *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 177, 201 (2d Cir. 2008); *United States v. Bin Laden*, 132 F. Supp. 2d 168, 187 (S.D.N.Y. 2001). *aff'd*, 552 F.3d 177 (2d Cir. 2008). The State also cites federal cases where the parties did not dispute this issue, so the court did not consider it. *See, e.g.*, *United States v. Rommy*, 506 F.3d 108, 131 (2d Cir. 2007); *United States v. Hasan*, 747 F. Supp. 2d 642, 657 (E.D. Va. 2010), *aff'd*, *United States v. Dire*, 680 F.3d 446 (4th Cir. 2012). We do not consider this issue to be in dispute. We will therefore treat *Miranda* procedures as applicable to United States officials' custodial interrogation of a foreign national in a foreign country in relation to a crime alleged to have been committed in the United States.

¶15 In *Edwards*, the defendant invoked his right to counsel after being arrested and read his *Miranda* rights. 451 U.S. at 478-79. Questioning ceased, and Edwards was taken to jail without receiving counsel. *Id.* at 479. The next morning, two different detectives returned to interview Edwards. *Id.* Edwards told his detention officer he did not want to talk to anyone, but the officer told Edwards he had to talk to the detectives. *Id.* The detectives again informed Edwards of his *Miranda* rights. *Id.* Edwards then implicated himself in the crime. *Id.* The Court held that Edwards's confession did not amount to a valid waiver and was inadmissible at trial. *Id.* at 487. The Court explained that once an accused invokes his *Miranda* right to counsel, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation, even if he is again advised of his rights. *Id.* at 484. Therefore, Edwards was not subject to further interrogation until counsel was made available to him or he initiated communication. *Id.* at 484-85.

¶16 In *Arizona v. Roberson*, the United States Supreme Court extended the *Edwards* rule to custodial interrogation

in a separate investigation. 486 U.S. 675, 677, 108 S. Ct. 2093, 100 L. Ed. 2d 704 (1988). In *Roberson*, the defendant was arrested at the scene of a burglary. *Id.* at 678. Roberson immediately requested an attorney, which the officer recorded in his written report. *Id.* Three days later, while Roberson was still in custody, a different officer interrogated him about a different burglary. *Id.* The officer was not aware that Roberson had already requested counsel. *Id.* After advising Roberson of his *Miranda* rights, the officer obtained an incriminating statement from Roberson about the other burglary. *Id.*

¶17 The Court held that once Roberson invoked his right to counsel, he could not be reinterrogated about an unrelated offense without first being provided counsel. *Id.* at 677-78. The Court refused to excuse the officer's ignorance of Roberson's previous request for counsel, explaining, "Whether a contemplated reinterrogation concerns the same or a different offense, or whether the same or different law enforcement authorities are involved in the second investigation, the same need to determine whether the suspect has requested counsel exists." *Id.* at 687-88. This is because the *Edwards* rule focuses on the state of mind of the suspect, not the police. *Id.* at 687. Therefore, *Roberson* makes clear that the Fifth Amendment right to counsel is not offense-specific. *McNeil v. Wisconsin*, 501 U.S. 171, 177, 111 S. Ct. 2204, 115 L. Ed. 2d 158 (1991).

¶18 Trochez-Jimenez urges this court to set aside the international context of his case and apply the *Edwards/Roberson* rule here. However, there is no legal precedent to compel us to extend the rule so broadly that it encompasses a foreign investigation by foreign officials with rights stemming from a foreign document. Indeed, courts considering the issue have refused to do so.

¶19 Military courts have consistently held that invocation of the right to counsel under a foreign document does not trigger the right to counsel under the United States Constitution. In *United States v. Vidal*, German police

arrested a United States soldier for raping a young German woman. 23 M.J. 319, 320-21 (C.M.A. 1987). He was informed of his right to counsel under German law and invoked that right. *Id.* at 321. United States military authorities subsequently arrived to question him. *Id.* They read him his *Miranda* rights, which he waived and then confessed to the rape. *Id.* at 321-22. The court acknowledged that if Vidal was first informed of his right to counsel by an American investigator, his request for counsel would have precluded subsequent American interrogation. *Id.* at 323. But, Vidal was interrogated by German police conducting an investigation initiated by German authorities in response to acts that violated German law. *Id.* The court concluded that the requirements of *Edwards* were not triggered by a request for counsel made to a foreign official. *Id.*

¶20 In *United States v. Coleman*, the United States Army Court of Military Review considered facts similar to *Vidal.* 25 M.J. 679 (A.C.M.R. 1987), *aff'd*, 26 M.J. 451 (C.M.A. 1988). German and United States Army officials both investigated a child's death in civilian housing. *Id.* at 682. The prime suspect was the child's American father. *Id.* During the investigation, he made an incriminating statement to German officials, then invoked his rights under German law to remain silent and have an attorney. *Id.* With full knowledge of this invocation, United States Army officials interviewed the suspect, who waived his *Miranda* rights and confessed. *Id.* The court found that United States officials did not conduct, instigate, or participate in the German interrogation of the suspect. *Id.* at 686.[8] Nor did United States officials take any action that could be considered subterfuge in obtaining a statement. *Id.* The court held that, because United States "law did not apply to the German action, the rule of *Edwards* had no trigger and could not attach to appellant's request for counsel made to the German police." *Id.* at 687.

---

[8] The *Coleman* court recognized that the *Vidal* court's conclusion was dicta but treated it as persuasive and reached the same conclusion. 25 M.J. at 682 n.1.

¶21 Coleman appealed. *United States v. Coleman*, 26 M.J. 451 (C.M.A. 1988). The United States Supreme Court decided *Roberson* in the interim. *Id.* at 453. The United States Court of Military Appeals upheld the lower court's holding in light of *Roberson*. Military courts have subsequently affirmed the rule that informing suspects of their *Miranda* rights at the outset of the American interview is sufficient. *See, e.g., United States v. Dock*, 40 M.J. 112, 116 (C.M.A. 1994); *United States v. Hinojosa*, 33 M.J. 353, 355 (C.M.A. 1991).

¶22 A Florida appellate court considered similar facts. *Holland v. State*, 813 So. 2d 1007, 1008-09 (Fla. Dist. Ct. App. 2002). In *Holland*, the defendant was arrested in Canada for using a stolen credit card that belonged to a recent homicide victim. *Id.* at 1008. Holland was read his rights under the Canadian Charter, including his right to an attorney. *Id.* at 1008-09. Holland spoke briefly with an attorney and told Canadian officers that he was advised not to speak with them. *Id.* at 1009. The officers did not interrogate Holland at any point. *Id.* The next day, Florida detectives arrived in Canada to question Holland about the murder. *Id.* They were told Holland was advised of his Canadian rights and had spoken with an attorney. *Id.* The officers read Holland his *Miranda* rights, which he waived. *Id.* He then confessed to the murder. *Id.* The Florida court held that *Miranda* applies only when custodial interrogation is imminent, so Holland could not invoke his *Miranda* rights before the United States officers arrived to interrogate him. *Id.* at 1010.

¶23 Trochez-Jimenez argues that the *Holland* case is inapplicable, because unlike Holland, he *was* subjected to custodial interrogation by Canadian officers.[9] However, the Florida court also rejected Holland's argument that his

---

[9] Trochez-Jimenez is correct that this distinguishes his case from Holland's. But, the fact that Holland agreed to be interrogated after consulting counsel goes to his right to remain silent, not his right to counsel. We are concerned here only with the invocation of the right to counsel affecting a subsequent communication with different officers on a different offense.

Fifth Amendment right to counsel was invoked by asserting his right to counsel under the Canadian Charter. *Id.* at 1010 n.2. It did so because the Canadian Charter and Fifth Amendment rights to counsel are distinct. *See id.* Invocation of the right to counsel under one document does not trigger the right to counsel under the other.

¶24 The *Edwards/Roberson* rule is undoubtedly a strong prophylactic rule intended to protect suspects from coercion inherent in custodial interrogation. Under *Edwards* and *Roberson*, if Trochez-Jimenez was first informed of his United States constitutional right to counsel by a United States official, his request for counsel would have precluded the King County detectives' subsequent interrogation. But, like Vidal and Coleman, Trochez-Jimenez was arrested by a foreign authority for violation of a foreign law. He was informed of his right to counsel under the Canadian Charter and interrogated by Canadian officials only about the Canadian immigration offense. Constable Jeffrey testified that he never questioned Trochez-Jimenez about the United States murder. Canada was not acting as a United States agent. King County detectives did not conduct, instigate, or participate in the Canadian interrogation of Trochez-Jimenez. There was no action by United States officials until they interviewed Trochez-Jimenez about the murder. As a result, there was no forum for Trochez-Jimenez to invoke his Fifth Amendment right to counsel until he was interrogated by United States officials.

¶25 On these facts, we find *Vidal* and *Coleman* persuasive. We hold that invocation of a right to counsel before foreign officials in a foreign investigation under a foreign rights document does not trigger the Fifth Amendment right to counsel. There was no error when the trial court denied Trochez-Jimenez's motion to suppress.

¶26 We affirm.

Cox and Schindler, JJ., concur.

Review granted at 177 Wn.2d 1019 (2013).